## C. C. FORBES, Appellee, v. THE BOONE VALLEY COAL & RAILWAY COMPANY, Appellant.

**Master and Servant:** ASSUMING RISK OF EMPLOYMENT: *Evidence.* Plaintiff had worked in a mine four months, and in mines similarly constructed for ten years, and knew that tracks laid in the entry way from the base of the mine to the bottom of the shaft were for the purpose of transporting loaded cars to the shaft, and empties back to the mine,—the latter by means of a mule hitched to the side of the string of cars,—and on coming out of the shaft he had frequently met empties returning. A custom in this and all the mines in which he had worked existed to move the loaded cars down to the shaft, and the empties back to the mine for the use of the night shift, just before quitting time. Having quit work fifteen minutes before quitting time, he started down the entry way, and was met by a string of empties hauled by a mule, "side-hitched" to the center of the string. At the same time some loaded cars descending by the force of gravity to the shaft overtook him, and to escape the empties he attempted to climb on to a loaded car and was injured. The cars were similar to those in general use, were not running fast, were under the control of an operator and were instantly stopped when he was injured. He had never complained that the exit from the mine was defective. *Held*, that he had assumed the risk and could not recover.

*Appeal from Boone District Court.*—HON. S. M. WEAVER, Judge.

WEDNESDAY, JANUARY 23, 1901.

ACTION at law to recover damages for personal in-- juries received by plaintiff while in defendant's employ. Trial to a jury, verdict and judgment for plaintiff, and de-- fendant appeals.—*Reversed.*

*Arthur T. Brown* and *Dyer & Stevens* for appellant.

*Jordon & Goodykoontz* for appellee.

DEEMER, J.—Plaintiff was injured in an entry way in defendant's coal mine, by having his foot crushed between two cars loaded with coal. The evidence shows that there is a shaft at defendant's mine, 60 feet deep, from which the entry way referred to extends about 150 feet, in a westerly direction, to the face of the mine. This entry way is from 10 to 12 feet in width, and from 5 to 6 feet in height. The floor of the entry for at least 150 feet from the shaft, is. occupied by two tracks, each 2 feet and 9 inches in width, that were used for running cars to and from the face of the mine. The space between the tracks is 3 feet in width. The south track was for empty, and the north for loaded, cars. The natural incline of the track was towards the east, so that loaded cars run of their own momentum for a considerable distance down the track towards the shaft. Empties were pushed or pulled back from the shaft towards the west by "side-hitching" a mule to the center of a string of cars, and driving him in the direction indicated. When so hitched the mule walked in the space between the tracks, and propelled the cars back to the face of the mine. Employes working at the face of the mine were compelled to us this entry way in going to and from the shaft, and it was their only means of ingress and egress to the mine. Plaintiff was a machine man, and worked with the day force. His duties called him to the face of the mine, where he was employed on the day he received his injury. His quitting

time was 5:30 P. M. On the day in question he quit at
5:15, however; being told by a co-employe that it was quit-
ting time. Immediately on quitting work he proceeded
down the entry way towards the shaft, in company with some
co-employes, and when about 70 feet from the shaft noticed
a "trip of empties," of about 10 or 12 cars, 20 or 30 feet
away, approaching him from the east. He also noticed
some loaded cars on the north side of him; says there were
10 or 12 that were moving towards the east. He further
testified that he knew that the empties were being moved by
a mule hitched to them in the manner hitherto mentioned.
That plaintiff's version of the accident may fully appear,
we quote the following from his testimoney at the trial: "I
do not know how many men were in front of me. Did not
recognize any of them. Barry and Bailey were right ahead
of me. They jumped into the empties. I tried to get in
after Bailey, but did not make it. I was crowded back by
the mule. I could not say how close the mule was to me, I
could not get into the car. When I turned, the empties were
running west, and I was going to get into the next empty.
I could not get into the next empty, and we was crowding
and jumping against each other, and there was loads on the
right-hand side, and I went up as far as the loads extended,
and got through into the loaded track, so that this mule that
was drawing the empties could not get by and keep it from
running over me; and just about that time some of them in
the crowd says, 'Look out for the trip,' and—Well, of course,
we was east of them, and I knew this,—that there was a trip
coming; and we was jumping around there, and this mule
had got far enough by so that you could get down by running
down between the cars and the mule, and the only show that
I had when I heard the cars coming was to jump on the end
of the loaded cars. I tried to do that. The coal there was
loose on the car, and I jumped quick, as I did not have much
time. The coal all slipped off the end of the car. There
was a chunck,—a pretty big chunk,—I had got loose with

this hand, and there was a big chunk laying on this hand here, and the cars had not jumped together yet, but I could hear them, and just about the time that I slipped down there they bumped together and caught my foot. At the time I stepped on the loaded track the mule pulling the empties was not very close. At the time I stepped in there they were crowding around. I heard some one say, "Look out for the trip.' I looked, and the mule was right just opposite me, and you could not run down between the tracks and go between the mule and the loads there, because it would run over you, and the only show that I had was to jump on the loaded car. The cars were not going very fast; running pretty good, though,—about as fast as a man could walk, perhaps a little faster. Just as I got on the loaded track I heard some one say, 'Look out for the trip.' A trip is known to coal miners as coal cars together; a trip of loads or a trip of empties; whatever they may be a train of cars; not a train, but a trip. There were three cars in that trip. When they came down against the loaded cars bfore I jumped to get out of the way from getting caught, I slipped and fell. Just about the time I fell I was holding on with my left hand, as well as I can remember. The cars bumped together and caught my foot, heel and ankle. * * * Never saw cars moved before in the mine by mules at quitting time, except on this occasion. I did not know there was any custom or rule of the company to move empty cars in this way." On cross-examination he testified as follows: "I did not see any one at the time I got the injury. I heard persons talking before I was hurt. When I got by the loaded cars I heard some one holler, 'Look out for the trip.' I understood the trip was coming. Did not see it. I was between the mule stable and the bottom at this time. I was about 30 or 40 feet from where the cages landed at the time I heard this statement, 'Look out for the trip.' Had my lamp on my cap. Do not re-

member whether it was burning or not. It is the men's
business that wear it to keep it burning. I made no signal
with my lamp to the driver of the mule which was pushing
the empties. I made no signal to the driver of the trip
with my lamp. I did not call to the driver of the mule to
stop. I made no effort to stop the mule. Q. How many
times did you have to pass the empties with the mule hitched
to them? A. I never counted. I could not say how many
times. Q. What would you do when you met a trip of
empties? A. If I was going out into the main entry, I
would listen. If I heard a driver coming, and it was in a
narrow place, I would run and get into a place where it was
wide enough. Have done that lots of times. Trips are li-
able to come in at any time. It was the duty of the miners
to look out for trips. Their duty to look out for them at
all times. I could hear the mule that was drawing the
empties. Did not see it. Could see the empties moving.
Could hear the driver. I could see the mule that was draw-
ing the empties, but did not know, and could not see, the
size of the mule. It was about 40 or 50 feet from the bot-
tom of the shaft where I was hurt. About 60 feet between
the mule stable and the bottom of the shaft. Could
not say exactly where Bailey got into the empty
Trappers are used back in the mines for tending
doors. They are not coal diggers. They open and
shut the doors as drivers come in and out. The cars, at the
time I saw them, I do not know whether they were moving
or not. The mule had got right up close to me. I could
not say how close. I would have no idea." There was
other evidence adduced by the plaintiff tending to show that
"quitting time" was 5:30 in the evening, and that at that
time the mules were in the stable and that no empties were
moved after that hour (5:30 P. M.). There was also evi-
dence to show that the cars were 20 inches high from the
bottom, had a 20-inch box, and that there was no trouble in
stepping into the empty cars. Evidence was also adduced

showing a system of signals by which the driver of the mules was controlled, and that plaintiff was perfectly familiar with the construction of mines and the manner of operating them.   Defendant introduced evidence to show that the cars were handled on the evening in question just as they were at all other times, and that plaintiff was perfectly familiar therewith and never made any objection thereto, and that plaintiff carelessly and negligently stepped in front of the moving train and was injured.   The undisputed evidence shows that the shaft and entry way were constructed in the usual and customary manner, and that it was operated as mines usually are in the different mining counties of the state.   The negligence charged is:  First, failure of defendant to furnish a reasonably safe exit from the mine; and, second, that the empty cars were propelled by unsuitable motive power, and the loaded cars were permitted to descend the grade by their own weight, and without adequate means to check or control their speed.   Appellant's argument deals with a number of questions that will be considered during the course of the opinion, but, before taking up the points, *seriatim,* it is well to state some general rules applicable to the relation of master and servant.

It is the duty of a master to use ordinary and reasonable care in providing his servants with a suitable place in which the work to be performed by them it to be done, and it is also his duty to furnish his servants with such machinery and appliances as may be used with reasonable safety.   He is not, however, an insurer against all accidents that may occur, and is not bound to furnish the best and latest improved machinery and appliances.   If he furnishes such machinery and appliances as are reasonably safe and suitable for the purpose, and provides a place where the work may be done with reasonable safety, and without exposure to dangers that are not within the obvious scope of the employment as the business is usually carried on, he has done his duty.   On the other hand, the servant, in accept-

ing employment in a hazardous  business, assumes such
risks as are incident to the ordinary discharge of his duties,
but not, of course, the risk of dangers arising from unsafe or
defective machinery or surroundings, unless he has, or may
be presumed to have had knowledge or notice thereof. If, how-
ever, he knows of the master's method of doing business,
hazardous though it be, and continues in the work, without
objection, after knowledge of the character of the place or
the condition of the appliances, he is deemed in law to have
assumed the risk, and cannot recover damages if injury fol-
lows.    He has the right to assume in the first instance, how-
ever, that the master has done his duty; and, until he dis-
covers or ought to discover the defect, he has the right to
rely on this assumption, and is not held to have assumed
any risks not ordinarily incident to the discharge of the
services for which he was employed.    The defendant con-
tends in argument that no negligence is shown; that plain-
tiff assumed the risk, because of his knowledge of the situa-
tion; and that he was guilty of contributory negligence.
The jury may have found, notwithstanding the fact that the
shaft and entry were constructed as such places are usually
built and maintained, that the defendant was negligent in
not constructing a wider entry, or in not providing places to
which employes might retreat with safety in case they met
moving cars; and, as such seems to be their finding, we can-
not interfere.    But it also appears that the plaintiff had
worked in the mine in question for more than four months
prior to the time he received his injuries, and in mines con-
structed on the same general plan for more than ten years.
He knew or must have known of the defective entry way.
He must also have known of the ordinary risk to be appre-
hended therefrom.    True, he should not be held to appre-
ciate dangers from defective appliances or risks incident to
the carelessness of vice principals; but all such risks as
might reasonably be apprehended from the construction and
operation of the entry way he accepted and assumed.    He

knew the purpose for which the tracks were laid, and must be held to have anticipated all such risks as were reasonably incident to the proper use of these tracks. It may be assumed that he had a right to presume the tracks would not be operated when the entry was being used as a means of exit by the employes of the mine, but he certainly knew that the tracks were intended for use, and that the empties were propelled back into the mines by the motive pawer hitherto mentioned. It is true, he says at one place in his tstimony that he did not know the manner of doing business during the daytime; but he afterwards testified that he had passed the mules with the empty cars frequently, and that he knew the north track was used for loaded cars, in order to get them to the shaft. The evidence as to the use of the entry way at or about "quitting time" is conflicting. Some of it tended to show that from and after 5:30 no cars were moved in either direction; that the mules were put up, and things were made ready for what was called the "night shift." But there is no dispute whatever that it was the universal custom to move the loaded cars down to the shaft, and the empties back into the mine for use by the night shift, just before quitting time; that this was not only the custom in the mine in question, but in all other mines in which plaintiff had worked. It must also be assumed that plaintiff knew the tracks in question were for some use. Indeed, he says that he knew what that use was, and says that he had frequently met trips of empties before this time. Plaintiff says, however, that he did not know of any custom to move care as these were being moved at the time when he met with his accident. If this be true, then he was negligent in not knowing, for he was bound to use ordinary care to inform himself of the rules and customs of the mine. And if, through failure to use this degree of care, he received his injuries, he cannot complain. The fact that he left his work 15 minutes earlier than the usual quitting time, while not conclusive, in view

of the rule permitting six men to use the shaft at any time, has a material bearing on both the questions of assumption of risk and of contributory negligence. He had not been permitted to leave in company with five others, and the jury had found that, had he quit work at the usual and proper time, he would not have been injured, contributory negligence on his part would have been established. He had the right, under the rule, to use the entry as a means of exit before quitting time; but, knowing the custom that prevailed in the mine to use the tracks in the entry way in sending loaded and empty cars thereon to and from the shaft just before quitting time, he assumed the risk incident to the use he made of the entry way at the time he received his injuries. An employe cannot close his eyes to what is going on around him. He has the right to assume that the master will do nothing to increase the ordinary hazards of the employment, but he cannot blindly go about his work, and close his eyes and ears to what is going on. He must ascertain the rules and customs of the mine, and, if he finds them hazardous, must make complaint to his employer. Plaintiff knew the tracks were in the entry; knew they were for use; knew how cars were sent down to the shaft, and how they were brought back; had met many "empty trips" to which mules were attached before the day he received his accident. He had worked in coal mines for many years, and knew or must have known of the customs prevailing in these mines. If he did no, know, it was because of his want of ordinary care and observation. Had plaintiff been injured before he had a chance to inform himself of the rules and customs of the mine, the case would assume a different aspect, but such is not the case. He had worked in mines operated as this one was for many years, and every witness save himself testified to knowledge of the customs prevailing in the mines. If he did not know thereof, it was because of his supine neglect. He made no complaint to his employer, and must be

held to have assumed the risk incident to the use of the entry in the manner he did. If the accident grew wout of the negligence of a co-employe in operating either the loaded or empty "trip," plaintiff cannot recover; for defendant is not responsible for the negligence of a co-employe. That was one of the hazards which plaintiff assumed. The question of defective brakes on the coal cars was not submitted to the jury, as we understand it. Indeed, the plaintiff makes no complaint in argument that the cars were not properly equipped. The operator of the loaded cars usually uses his foot or a stick of wood as a brake, and, as the incline was not steep, could usually stop the car by the use of one or the other. The cars were similar to those in general use, and no evidence was adduced to show that they were unsafe or defective. The loaded ones that were passing down towards the shaft where plaintiff was injured were not running at an excessive rate of speed, and they stopped almost instantly when plaintiff received his injury. Plaintiff says that it was his duty to look out for loaded cars, and that he had frequently passed empties coming out from the shaft. He knew the exact condition of affairs, or, in the exercise of ordinary care, should have known, and, we think, assumed the risk. *Beckman v. Coal Co.,* 90 Iowa, 252, is quite in point on this proposition. See, also, *Moran v. Harris,* 63 Iowa, 390; *Scott v. Coal Co.,* 90 Iowa, 689.

The trial court gave instructions announcing the correct rules of law, and if the jury had followed them it would have returned a verdict for defendant. In any event, defendant's motion to direct a verdict, filed at the close of plaintiff's evidence, should have been sustained. The judgment must, therefore, be REVERSED.