CLARA CAMPBELL, Admrx. of the Estate of DANIEL CAMPBELL, Deceased, Appellant, v. THE ILLINOIS CENTRAL RAILROAD COMPANY and the DUBUQUE & SIOUX CITY RAILROAD COMPANY, Appellees.

**Railroads:** INJURY TO SERVANT: NEGLIGENCE OF CO-EMPLOYE: CONTRIBUTORY NEGLIGENCE: EVIDENCE. In an action to recover for the death of the foreman of a gravel pit while engaged in loading cars, the evidence is considered and held, that there was no actionable

negligence on the part of the conductor of the train, and even if there was, deceased was guilty of such contributory negligence as to preclude recovery by the administrator.

**Assumption of risk:** EVIDENCE.  Under the evidence it is held that an employe for whose death recovery is sought, had such a knowledge of the manner in which the work had theretofore been done, that he assumed the risk incident thereto.

*Appeal from Cherokee District Court.*— HON. WILLIAM HUTCHINSON, Judge.

THURSDAY, JUNE 9, 1904.

ACTION at law to recover damages for the death of Daniel Campbell, due, as is alleged, to the carelessness and negligence of the defendants, their agents, servants, and employes.  Trial to a jury, directed verdict for the defendants, and plaintiff appeals.— *Affirmed.*

*William Mulvaney* and *A. Van Wagenan,* for appellant.

*W. S. Kenyon* and *E. C. Herrick,* for appellees.

DEEMER, C. J.—The defendant Illinois Central Railroad Company was at the time of the accident which resulted

1. INJURY TO SERVANT: negligence of co-employe; contributory negligence; evidence.

in the death of Daniel Campbell, removing material from a gravel pit some distance south of the city of Cherokee.  It was operating a steam shovel, and an engine moved ballast cars to and from the pit. One Hogan was the conductor in charge of the engine, and Campbell had charge of the work in the pit as supervisor, under the general supervision of the road master.  He directed the men, of whom there were a number engaged in the enterprise; and had control over the movement of the cars when the engine was not attached to them.  It was the custom for the engine to bring six or eight ballast cars into the pit, and to run them past the steam shovel, where they

were left for the purpose of being shoved two at a time down to the shovel, where they were, to use the vernacular of the business, " spotted "; that is to say they were moved until the forward end of the car was opposite the steam shovel, and when the shovel had been dumped three or four times the car was again moved, so that the shovel might deposit its load in a part of the car not already filled. About four shifts of the car were necessary before it was filled. The cars were pushed by hand, from where they were left by the engine, down to near where they were to be filled, and were afterward shifted by the use of pinch bars in the hands of defendants' employes. Some years before two engines were engaged in the work — one for hauling the loaded and unloaded cars to and from the pit, and the other for placing or spotting the cars so that they might be easily and expeditiously loaded. But for many months prior to the accident in question there was but one engine employed, and the cars were spotted by hand in the manner heretofore indicated. The cars were filled and removed very rapidly; the engine coupling onto cars for the purpose of removing them from the pit from thirty-three to thirty-five times a day. In other words, these couplings were made at least every fifteen minutes during the progress of the work. Campbell was perfectly familiar with the manner of doing the work. In fact, he directed and planned it.

On the day of the accident two cars had been pushed by hand down to near the steam shovel. The forward one had been pinched until the bumpers between it and the next car in the rear were two or three feet apart. The engine had moved out some loaded cars onto another side track, according to custom, and was coming down to couple onto the cars which had been left at the shovel. The conductor was on the end of the car next to the engine, and the engine came down front end foremost. The brakeman was standing on the front run board, and the conductor, as we have said, was on the front end of the ballast car,

which was then being loaded. He was so situated, however, that it was impossible for him to see any one on the ground at the other end of the car, and, save for a custom, of which we may say that he must have had notice, did not know that any one was at the other end of the car pushing or pinching it. There was in fact, a short time before the accident, an employe of the company by the name of Shea, who was using a bar in moving the car. The exact position of Campbell at this time is not disclosed. He was on the other side of the car from where Shea was, and had been talking but a few moments before with the conductor, who was on the front end of the car. He evidently came down the side of the car from north to south, and on the east side thereof. When he arrived at the opening between the cars, which must have been when the engine was in plain sight to him had he looked, he spoke to Shea, directing him to " poke bank," saying that he could move the car alone. For some reason, not shown by the record, he immediately undertook to pass between the cars, and just as he had arrived half way through, the engine struck the forward car, throwing it back toward the next one in the rear, and catching Campbell between the bumpers, crushed his sides and body, and inflicted upon him injuries from which he presently died. Immediately after Campbell received his injuries, Hogan, the conductor, hurried to where he (Campbell) was, whereupon the following colloquy occurred. Campbell, after stating that he was mortally wounded, said to Hogan, " Why didn't you holler, Johnnie? " Hogan replied, " I did, Dan," to which Campbell responded, " No, you didn't." The evidence shows that the conductor gave the engineer the signal to come forward and couple onto the car. At that time he (the conductor) was not in a position to see any one between the car upon which he was standing and the next one south. He knew that Campbell had gone back in that direction, but did not know that he had gone between the cars. The evidence also shows without dispute that in pinch-

ing cars the operator does not go between them, but stands outside the rail; and that, if Campbell had been in that position, the accident would not have happened. Moreover, it would not have occurred, save for the fact that he (Campbell) went between the bumpers of the two cars. Why Campbell went between these cars is not shown, nor is there any evidence to show whose duty it was to give notice of the approach of the engine. We gather from the record that not only Campbell, but also all other employes immediately engaged in the work, sounded the alarm when the engine approached.

We have already referred in a general way to the manner in which the work was done, but it should also be stated that the cars were pinched only when the engine was engaged in other work. After taking out the loaded cars and placing them upon the siding, the custom was for it to return and to couple onto the cars which were being loaded, and they were thereafter spotted by the engine, or so moved as that the shovel could properly distribute the gravel. The engine would generally return before a car was half loaded after being pinched into position by the use of a crowbar. Campbell had charge of the movement of the cars and of the entire work in the pit until the engine was coupled onto them. After that the train was in charge of the conductor and the brakeman. Campbell was perfectly familiar with the manner of doing the work, for he controlled and directed it; and he also knew about the time the engine would return after taking out the loaded cars.

The record is entirely devoid of any evidence tending to show that it was the custom or duty either of the conductor or the engineer to give warning of the approach of the engine. If inferences are to be indulged in, it is quite as consistent to say that it was Campbell's duty to give notice to the employes under his direction, and who were working about the cars and pinching them, of the approach of the engine, as that it was the duty of the engineer or conductor of the train to do so. Indeed, the evidence shows

that until the engine was coupled onto the cars the conductor was under the control and direction of Campbell. It is shown that Campbell gave directions for the movement of the cars down until the time the engine was coupled thereto. There is also a break in the testimony as to what Campbell was doing from the time he left Hogan at the north end of the car down until he appeared at the opening between the two ballast cars, but, as the interval was very brief, we may assume that he walked directly back along the side of the car to the place where he spoke to Shea. From the position where he stood when talking to Hogan the engine was in plain sight, and, knowing the universal custom, we may well assume that Campbell knew it was coming back to couple onto the cars.

Now, while many grounds of negligence are charged in the petition, there is but one which need be considered, and that the failure of the conductor in charge of the engine to give notice of its approach, and his giving the signal to the engineer to couple onto the cars without knowing that the men working about them were in places of safety. Whether or not he was negligent depends almost wholly upon whether he owed any duty to Campbell or to the men about the cars, and, if so, the nature of that duty. We have set forth all the relevant evidence on this proposition. In it there is an entire lack of any testimony which tends to show that any duty devolved upon the conductor to give notice of the approach of the engine. If there was any such duty, it was more honored in the breach than in its observance. Of course, the conductor knew that men were likely to be using a bar in pinching the ballast cars; and it was his duty not to wantonly injure them, or to carelessly go about his work; but it also appears in this connection that no one would have been injured had they been pinching the cars. In any event, the conductor might well have assumed that Campbell knew of the approach of the engine, and that when he went back to the opening between the cars he would

govern himself accordingly; that he would not place himself between the bumpers, and in a place of imminent danger, but that he would look after his own safety, and give notice to any other exposed employe as was his duty. Campbell was perfectly familiar with the manner of doing the work, and of the likelihood of the engine returning and coupling onto the cars. So that, if he did not actually see it returning after taking out the loaded cars, he knew that it was likely to return at that very time, and was bound to have such fact in mind. There is nothing but his declarations made immediately after the accident to indicate that he was relying on any signal from the conductor; but this declaration, so made, is not in itself sufficient to show any custom or duty on the part of the conductor, especially in view of the fact that the testimony shows that it was as much the duty of Campbell himself, or of the employes under his direction, to give warning of the approach of the engine. Campbell was so familiar with the manner in which the work had been done as that he assumed all risks incident thereto, not superinduced by some active negligence on the part of his co-employes, which he had no reason to anticipate. Of course, if there was any showing of negligence on the part of the conductor after he knew of Campbell's danger, we should have a different case, and would be inclined to say that the case should have gone to the jury.

But assuming that he knew Campbell was going back to the other end of the car, and also knew that he did not have knowledge of the approach of the engine, still it will not do to assume that he (Campbell) would immediately step between the bumpers, and thus place himself in a position of danger. Had he gone back to pinch the car not knowing of the approach of the engine, and had properly used a bar for the " spotting " of the car, the testimony clearly shows that he would not have been injured. Hogan, the conductor, had the right to act upon appearances. He had seen Campbell, but a few moments before the accident,

at the north end of the car. Both he and Campbell could have seen the engine approaching. Both knew of the custom which existed with reference to the doing of the work. When Campbell left Hogan, he (Hogan) had the right to assume not only that he (Campbell) would not immediately put himself in a position of imminent danger, but that he would warn others of the approach of the engine. Moreover, whether Campbell actually knew of the presence of the engine or not, it was his duty to be on the lookout for it, for the men who were working on or about the cars were under his control and direction. He had charge of the men, and always gave orders with reference to the pinching of the cars. He was as much bound to look out for the approach of the engine as was Hogan, for he had men under his charge who were working about the cars and in places of danger. Knowing, then, this fact, Hogan might very well assume that he (Campbell) knew of the approach of the engine, and would not put himself in a place of extreme danger. If the evidence showed any duty on the part of the engineer to give warning, we should have a different case. But there is an entire dearth of evidence on this subject. We do not think the evidence was sufficient to take the case to the jury. There is no negligence shown, and, even if there were, Campbell's own conduct was so negligent as to defeat an action by his administratrix for his death. As supporting these conclusions, see *Haden v. R. R. Co.*, 99 Iowa, 735; *Keefe v. C. & N. W. R. R. Co.*, 92 Iowa, 186; *Nelling v. C., St. P. & K. C. Co.*, 98 Iowa, 554; *Aerkfetz v. Humphreys*, 12 Sup. Ct. 835 (36 L. Ed. 758); *Magee v. C. & D. W. R.*, 82 Iowa, 249; *Dillon v. Iowa Central Co.*, 118 Iowa, 645.

Not only this, but on the record now before us it must be held that Campbell, because of his knowledge of the man-

**2. ASSUMPTION OF RISK: evidence.** ner in which the work had theretofore been done, assumed the risk incident thereto. *Beckman v. Coal Co.*, 90 Iowa, 252; *Forbes v. R. R. & Coal Co.*, 113 Iowa, 94; *Martin v. R. R. Co.*, 118 Iowa, 155.

Having gone over the record with care, we discover no sufficient testimony on which a verdict for plaintiff might have been sustained. The trial court was right in directing a verdict, and the judgment is AFFIRMED.