[No. 15468. Department Two. February 3, 1920.]

JOHN LOGAN et al., *Respondents,* v. EUGENE R. DAY et al., *Appellants.*[1]

MASTER AND SERVANT (93, 98)—ASSUMPTION OF RISKS—MINING—SERVANT'S DUTY TO INSPECT. Miners, injured by the fall of overhead rock while at work in a chamber, assumed the risks, where it was their duty to make an inspection of the walls before starting work, and to make them safe or report any unsafe condition which they could not remedy, and where they went to work without inspecting or reporting upon a portion of the walls which they could not inspect because out of reach.

SAME (93, 98, 100)—ASSUMPTION OF RISKS—MINING—NOTICE—CHANGING CONDITIONS. Miners working in a chamber where conditions were constantly changing assumed the risks where they elected to continue working in a dangerous place requiring temporary timbers without complaint or request for timbers.

SAME (157, 161)—ASSUMPTION OF RISKS—QUESTIONS FOR JURY—INFERENCE FROM INSPECTION. Where miners were injured by the fall of overhead rock and there was no testimony tending to indicate that it fell from walls that had not been inspected, and they did not know where it fell from, the fact that part of the walls had been carefully inspected does not warrant the inference or presumption that it fell from some other part of the wall.

Appeal from a judgment of the superior court for Spokane county, Oswald, J., entered March 8, 1919, granting a new trial, after granting a nonsuit, in an action for personal injuries sustained by employees in a mine. Reversed.

[1] Reported in 187 Pac. 913.

*Plummer & Lavin* and *John H. Wourms,* for appellants.

*Graves, Kizer & Graves,* for respondents.

BRIDGES, J.—Suit for personal injuries occurring in a mine.

At the close of plaintiffs' case, the defendants moved for a nonsuit, which was granted; later the court, believing that it had erred, granted plaintiffs a new trial. The defendants have appealed.

The facts are substantially as follows: The mine in which the respondents were injured was worked by driving tunnels into the mountain side until the ore body was reached. The ore vein was then mined upwards towards the surface of the mountain. The vein stood at an angle of about seventy degrees. The ore was mined by driving chambers, called "uprises." The top, or ceiling, of the ore body is generally spoken of as the "back." These chambers are usually about nine feet high. At the time of the injury in question, the uprises extended about fifty feet and there were five chambers therein. The ore is blasted down and is removed, and upright posts, about nine feet in length, are set and a floor placed on top of these posts. There are three openings in the floor, the center one of which is a chute through which the ore is sent to the bottom of the mine. When the floor has once been built, further blasting takes place and the ore from the ceiling or back of the vein drops down on the floor, and when there are some twelve feet of ore on the floor, the blasting stops and the ore is put down the chute. As each chamber is completed it is permanently timbered. Two shifts work in each chamber; one at night and the other during the day. Respondents had the day shift. The injury in question occurred in the fifth chamber. For two or three days blasting

had been done, and on the evening before the respond-
ents went to work, there were about twelve feet of ore
on the floor of the fifth chamber. The night shift had
worked at putting this ore down the chute. This work
is called ''mucking.'' When the respondents went to
work on the morning they were injured, they found
that the night crew had put down the chute all but
about twelve tons of the ore, which it was their duty
to remove. They expected to do this by noon of that
day.

When the night crew started to work, it was their
duty to make an inspection of the exposed walls of the
chamber to see whether or not any loose earth or
rocks were likely to fall upon them. This inspection
is done by sounding the sides of the chamber with a
bar of iron or steel. If any loose rock or material is
struck by the bar it will sound hollow and that would
indicate that it is likely to fall. If the wall is solid
it will give the bar of iron a firm, solid ring. Any
material which the inspection indicates is likely to
fall is barred down by the miners. It was the duty
of the respondents to make a like inspection when they
went to work. When they went to work on the morn-
ing of the day they were injured, they found that the
distance from the floor to the ceiling, or back, was
some seventeen or eighteen feet. They at once in-
spected the chamber by sounding it and barring
down, until they believed they had barred down all the
material that was loose. So much of the ore had been
removed by the night shift that they could make an
inspection of only about nine feet of the walls be-
cause they could not reach higher than that. They
spent about an hour and a half making this inspec-
tion; they then commenced mucking out, and had been
at that work an hour or more when a large rock fell
on them from the hanging wall and each was severely

injured. During the forenoon before their injury, the foreman, or boss, came to the chamber where the respondents were working for the purpose of determining how it should be permanently timbered, but he did not make any inspection. So far as the power of the respondents to inspect is concerned, the chamber may be divided into three parts; (1) the upper eight or nine feet which respondents could not inspect because they could not reach it, and (2) the middle portion of the chamber, being that portion which they were able to, and did, inspect, and (3) that portion of the walls against which the remaining ore rested, and which, of course, could not be inspected, except as the ore was removed.

The respondents were experienced miners. They had nothing to do with the timbering of the mine; that duty devolved upon certain other employees. They were unable to tell from what portion of the hanging wall the rock which injured them came.

The reason the nonsuit was set aside and a new trial granted was stated by the court to be as follows:

"In granting the nonsuit in this case I was of the opinion that the minds of reasonable men could not differ in reaching the conclusion from the evidence that the rock which injured plaintiffs came from the nine foot area. In arriving at that conclusion, I overlooked the inference of the fact (or presumption of fact) that the rock came from above the nine foot area, which the jury would be entitled to consider by reason of the plaintiffs' testimony of carefully inspecting and sounding the rock in the nine foot area."

In their brief, respondents assert that, while the court was right in granting the new trial, it reached its conclusion by false reasoning. They contend that the new trial was properly granted upon the theory that defendants were obliged to take all reasonable precautions to make plaintiffs' working place safe.

They concede that it was unquestionably their duty, when they came into the working chamber, to test the walls within their reach, and if they found loose or insecure rock, to bar it down. They also concede that it was unquestionably their duty to call the attention of the shift boss, or foreman, to any unsafe condition which they discovered and could not remedy. As a general proposition, the rule of law stated by respondents is correct, but it is not and cannot be correct in those instances where the duty of inspection for the purpose of making safe rests upon the servant. The cases cited by respondents are instances where there was no duty resting upon the servant to inspect and keep safe his place of labor. Such were the cases of *McDonough v. Great Northern R. Co.*, 15 Wash. 244, 46 Pac. 334; *McMillan v. North Star Min. Co.*, 32 Wash. 579, 73 Pac. 685, 98 Am. St. 908; *Mullin v. Northern Pac. R. Co.*, 38 Wash. 550, 80 Pac. 814; *Cheatam v. Hogan*, 50 Wash. 465, 97 Pac. 499, 22 L. R. A. (N. S.) 951; *McKenzie v. North Coast Colliery Co.*, 55 Wash. 495, 104 Pac. 801, 28 L. R. A. (N. S.) 1244, and *Cox v. Wilkeson Coal & Coke Co.*, 61 Wash. 343, 112 Pac. 231. But these cases, and others of like tenor cited by respondents, are inapplicable to the facts of this case. One of the respondents testified as follows: "When you first go on shift you always examine around to see what you are up against. If there is any rock hanging over you, you take it down. One man usually takes the pick and the other man the bar and go over the walls and you take and tap and hit them, tap them with the bar or end of it, and if the rock is loose it sounds drummy; if it is solid it will ring and make the steel ring. We tapped down pretty good. It was a very wet place, water running down there always, loosening up a certain amount of rock. We barred down what we could and sounded it all and it seemed

in fair condition.'' There was other testimony of like character. It is, therefore, plain that the duty of inspection rested upon the employees and not upon the master. If the place was, or became, unsafe, it was their duty to bar down and make it safe. If they were unable for any reason to make it safe by barring down, then it was their duty to stop their work and inform the foreman of the unsafe condition. But respondents assert that the material of the walls in question was such as that the action of the air and water would make them unsafe within an hour or two after they had been inspected, and that because thereof it was the duty of the appellants to put in temporary timbers. It appears that at times it is found necessary to put in the temporary timbers in order to hold the walls. But the duty of inspection was on respondents; they were bound to know more about the conditions than any one else. They were experienced miners. If temporary timbering was necessary, it was their duty to so inform the foreman or timberman. The conditions of their working place were constantly changing. If the place was dangerous, they knew it before any one else could know it. If they elected to work in the dangerous place, without complaint and without requesting temporary timbers, they assumed the risks. The law applicable to the facts here may be found in the following cases: *Smith v. Hecla Min. Co.*, 38 Wash. 454, 80 Pac. 779; *White v. Spokane & Inland Empire R. Co.*, 54 Wash. 679, 103 Pac. 1119; *Cully v. Northern Pac. R. Co.*, 35 Wash. 241, 77 Pac. 202. In *Smith v. Hecla Min. Co.*, *supra*, the court said:

''Mining is known to be dangerous work. Respondent admits that he knew this, that he knew there was more or less danger from falling rock, that 'air-slacking' was constantly going on, which loosened the

rock overhead and made it more dangerous from day to day. As a 'mucker' it was necessary for him to do much of his work ahead of the timbering—that is, he must remove the ore thrown down by the blasting, before the timbers could be placed in position to protect him. The very nature of mining is such that the working places of the miners and 'muckers' are constantly undergoing changes. These changes are necessarily accompanied with dangers to the workmen notwithstanding careful inspection and protection by the master.''

In *Cully v. Northern Pac. R. Co., supra,* this court said:

''The appellant seeks to invoke the rule in this case that it is the duty of the master to furnish the servant with a safe place in which to work. This rule, however, has no application to this class of employment.''

The court there quotes the following from a Wisconsin case:

''The place to work is being changed constantly, and is necessarily incomplete and dangerous; and the employe knows it, and accepts such risks as are ordinarily present in such operations.'' *Kath v. Wisconsin Cent. R. Co.,* 121 Wis. 503, 99 N. W. 217.

In the case of *Jones v. Florence Min. Co.,* 66 Wis. 268, 28 N. W. 207, 57 Am. Rep. 269, the court said:

''But the danger resulting from leaving loose stones or ore in the roof or sides of the mine is a danger which the employer may well impose the duty of guarding against upon those working in the mine. Such danger is the direct result of their operations, and they are always on the ground, and have better facilities for knowledge when a danger of that kind exists, and for removing the same, than the pit boss or captain of the mine, and there would seem to be no ground for holding that the owner of the mine may not impose such duty upon the miners themselves.''

To the same effect see the following cases: *Porter v. Silver Creek & Morris Coal Co.,* 84 Wis. 418, 54 N. W. 1019; *Forbes v. Boone Valley Coal & R. Co.,* 113 Iowa 94, 84 N. W. 970; *Finlayson v. Utica Min. Co.,* 67 Fed. 507; *Coal & Mining Co. v. Clay's Adm'r,* 51 Ohio St. 542, 38 N. E. 610, 25 L. R. A. 848; *Petaja v. Aurora Iron Min. Co.,* 106 Mich. 463, 64 N. W. 335, 66 N. W. 951, 58 Am. St. 505, 32 L. R. A. 435.

We are clearly of the opinion that a new trial could not properly be granted upon the theory advanced and argued by respondents. Nor was the court justified in granting a new trial upon its own theory, to wit, that the jury had a right to consider whether or not the rock came from above the nine-foot area which the respondents were able to inspect. There is no testimony in the record tending to indicate that the rock came from above the inspected area. The respondents themselves did not know where it came from. The only witness who undertook to testify on that question was Fitzpatrick, who said that the rock came from "about the bottom of the stope; was about three feet above the timbers, the hanging wall," and that "it seemed to be about shoulder high," and that it was "about four feet up from the floor." In addition to this, it is shown that it was the duty of the night crew to inspect and bar down those portions of the walls they found exposed. When they went to work, there were only some six or seven feet between the top of the ore on which they stood and the ceiling or back. It must be presumed that the night crew properly inspected these portions of the walls. It would, therefore, conclusively appear that the rock fell either from that portion of the hanging wall which had previously been inspected by the respondents, or from that portion near the floor and against which the ore had rested. It was their duty to inspect and bar

down the walls as they removed the ore from them. Since, therefore, the testimony shows that the rock did not come from that portion of the wall nearest the ceiling and which the respondents could not inspect on account of its height, the court was in error in his conclusion that the case should have been submitted to the jury upon the theory that the rock might have come from the upper or uninspected portion of the chamber. But even if it be assumed that the rock came from the uninspected portion of the chamber, still the nonsuit was properly granted because, if the respondents could not, for any reason, inspect that portion of the wall, it was their duty to have so notified the foreman in order that he might furnish them ladders and tools for that purpose, or make the inspection himself.

We are of the opinion that the trial court properly granted the nonsuit and erred in granting a new trial. The judgment is reversed, and the cause remanded with instructions to dismiss.

HOLCOMB, C. J., MOUNT, TOLMAN, and FULLERTON, JJ., concur.