JOSEPH JACOBS v. THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY.

*Master and servant—Negligence—Assumption of risk.*

A verdict is held to have been properly directed for the defendant in this case, as, under the undisputed circumstances, the plaintiff must be held to have accepted the risk of the caboose-car, in which he was sleeping while it was standing upon an extension track used during the night to shove cars in upon, being struck by such cars, and therefore to have no cause of action on account of injuries received in consequence of such collision.

Error to Kent. (Grove, J.) Argued December 3, 1890. Decided December 24, 1890.

Negligence case. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Godwin, Adsit & McKnight,* for appellant.

*FitzGerald & Barry,* for defendant.

MORSE, J. The theory of plaintiff's declaration in this case is that, while he was engaged in the employ of the defendant as a brakeman, the defendant agreed to and did furnish him a place in one of its cars to sleep nights while he was so employed, which said car was to be and remain on a side track of the defendant company in a convenient and safe place, for the use of the plaintiff to sleep in, out of all danger of passing trains and engines when so occupied by plaintiff; and that it became and was the duty of defendant to furnish said plaintiff a safe and reasonable car, and a safe place for the same, free from all danger, and to maintain a separate track for said car while used for sleeping, and for no other purpose, as is the custom, for the protection of said plaintiff while so sleeping, and so to conduct its business as not to strike or in any way interfere with said car while so used for sleeping purposes, and to use all due and reasonable care and caution to prevent any striking of said car and injury to plaintiff thereby; but that defendant neglected its said duty, and on October 3, 1888, the said car was placed upon a side track, but which track was used for business purposes, yet apparently out of all danger of being struck by passing trains and moving cars; and plaintiff, being informed by defendant that the car was in a safe place, and out of danger, went to sleep therein. He alleges that, without any fault of his own, and through the negligence of the company in not maintaining a separate track for said car, and in running an engine and cars against the car, in which the plaintiff was sleeping, in a violent, unguarded, and negligent manner, he was severely injured. It is also alleged in one of the counts that the defendant granted permission

to the plaintiff to sleep in and occupy one of the cars used for that purpose, and agreed with him that, while he was in the employ of the defendant, he might occupy said car for sleeping purposes; and that, for the convenience and profit of both plaintiff and defendant, the defendant agreed that there should be always located, at a convenient and safe place upon the line of its railway, a car for the occupancy of the plaintiff for sleeping purposes; and that, relying upon such agreement, he was sleeping in the said car at the time of the injury; and further, alleging, substantially, the same duty and neglect as hereinbefore stated.

At the close of the plaintiff's proofs, the court directed a verdict in favor of the defendant.

The plaintiff's case as made by the testimony is substantially as follows: Jacobs was employed as a brakeman upon the line of defendant's road running from Grand Rapids to White Pigeon. He lived at Grand Rapids, and when he was there stayed overnight in his own house. He commenced work in the spring of 1888. He was employed by and got all his orders from his conductor, Charles Lynde, who kept his time. He received his pay from month to month from the company pay-car, and never talked with or received any directions from any officer of the company save this conductor. When he hired out as brakeman, he asked Lynde, "whether it was the same thing, sleeping in cars, like it had been years before." In reply, Lynde told him to bring his bedding and sleep in the cars. Plaintiff testified that Lynde said that it was customary to sleep in the cars as it had been before when plaintiff had been on the road. Plaintiff had been a brakemen on the same road between Grand Rapids and White Pigeon 16 years before, when, he testified, it was the custom of the brakemen to sleep in the caboose-cars. He took his bedding into the caboose-car

some six weeks after he commenced work in 1888, before that time sleeping in the car, but using bedding belonging to others. This "caboose-car," as it was called, was part of a coach, and a part was the conductor's office and a washing-room. One end of it was furnished with seats, and used for 'passengers, and for the men to sleep in. Another brakeman slept in the car with plaintiff. When the car stopped overnight, it was run upon a side track, which was used for the storing of cars. The defendant used the track more or less while plaintiff was sleeping in this caboose-car to put in and take out cars during the night. The plaintiff was well aware of this practice, and testified that sometimes they would run against his car and push it down the track, but could not remember how many times it had been struck before the night he claims to have been injured. On the night of October 3, 1888, plaintiff was awakened by a "terrible jar" between midnight and 4 o'clock in the morning. He had been asleep lying on his back in his bunk. His head was towards the car that struck the one he was in. He thinks "it drove his head against the end of the seat." He woke up with a pain in his neck and head. It affected him so he thought his neck had been broken. There were two other men sleeping in the car. They were not injured, and did not get up. The car in which they slept was moved but little, if any. It is claimed that plaintiff's neck was partially dislocated, and that a severe and permanent injury had resulted from this collision of the cars and jarring of the plaintiff.

It was attempted to be shown that it was the custom of this railroad company, and of all the others in this State, to furnish and maintain separate tracks upon which to place these caboose or sleeping cars,—tracks upon which no business was done while these cars were being used for sleeping purposes,—but no such custom

was established by the testimony. The plaintiff's counsel insist that it was the duty of the defendant to maintain a separate track for the caboose-cars for the men to sleep in at the terminal points on the road. We do not think the duty is shown in the present case. There is no testimony tending to show that, previous to the injury to the plaintiff, any such separate tracks were maintained by the defendant, and the fact that after this accident happened the company did build and maintain such separate track at White Pigeon has no bearing upon the duty of the defendant to the plaintiff before that time. Nor is the agreement on the part of the company to provide an absolutely safe place for the car in which plaintiff was sleeping, free from all danger of such car being struck or run against by moving engines and cars, made out by the testimony.

The plaintiff shows how he first came to sleep in the cars on this road as follows:

"*Q.* Do you know of your own knowledge whether there was the same custom or a similar manner of sleeping in cars on the other divisions of this Michigan Southern Railroad?

"*A.* I do. I know by my own knowledge, for I have slept in them before in the division between Elkhart and Chicago.

"*Q.* Now you may state whether or not a similar custom exists on the other divisions of the road.

"*A.* About sixteen, 15 or 16, years ago, in that neighborhood, I was at Elkhart, and hired out to a Lake Shore Company conductor for to brake on the west end there, from Elkhart to Chicago. I hired out in the afternoon, between three and four o'clock, and he took me to the caboose track and showed me the car, and he says: 'There is our car. There is where we make our home, in there. You can sleep in there. You can cook your meals in there, if you want to buy your own provisions, and go in there and cook them.' I did not do any cooking in there, but I slept in there from the time until the train left, which was called there 11:45—almost

midnight—and went to Chicago. I only made two trips on that division. I came back on the Kalamazoo division, and have only worked on two divisions on the road. I do not think I have ever been over the other divisions of the road during that time. What they call the main line between Chicago and Toledo runs through White Pigeon, only the Kalamazoo division terminates at White Pigeon."

He further testified that on his last hiring the conductor gave him the privilege of sleeping in this car. When asked if he did not sleep there for his own convenience, he answered:

"I slept there in the car just as much for my own accommodations as I did for the company; for I would suppose that if I was wanted they would find me in the car."

He further testified that he did not sleep on the car when at Grand Rapids, because he had a better bed at home, but could not answer why it was not equally beneficial for the company that he should sleep in the car at one place as the other.

It is evident that the permission or privilege to sleep in the car was granted to him in the situation that the car was, with all the risks pertaining to its situation and condition on the track, and subject to the natural and ordinary risks of the business customarily done upon the track where it was left during the night. It appears that during all his last employment before the accident to him this car was invariably left upon the same track, which was a long extension track, and the first track south of the main line track. This extension track was used during the night to shove cars in upon, and this would push the caboose-car further down the track. This was a matter of which plaintiff well knew, but he testifies that he did not feel afraid of any injury therefrom. On this particular night it appears that the brakes

of the caboose-car were very firmly set, so that it was scarcely moved, if at all. The car that struck it stayed there, and was a car manifestly shoved in upon the track according to the usual custom and practice of the defendant. It may have been shoved in with more force than usual, or the caboose-car may have offered more resistance than usual. The other persons were not injured in the slightest, and neither they nor the plaintiff thought the occurrence of sufficient importance to be examined for its cause at the time. None of them got up and went out of the car until morning.

The character of the hurt to plaintiff, if it was caused by this jar of his car, is somewhat remarkable. He kept right on at work for the defendant the rest of the month of October, and slept in the car as usual. He reported the matter to no one save the conductor. There began the next day a swelling upon his neck, which kept growing until it was "as large as the size of a hen's egg." The company's physician came to see him four or five weeks after the accident. It does not appear that he consulted any physician before that time, and the physician of the defendant did not come at his solicitation, but was sent to examine him by the company. The injury according to his testimony and that of several physicians, at the time of the trial, showed a partial dislocation of his neck, and a general and permanent weakness of body as a probable result of such injury. If this condition is traceable to this accident, the injury must have been caused by the position in which the plaintiff was lying when the collision occurred, as it is evident that the jar was not such as would ordinarily have done such an injury to a person sleeping in the car.

But in law, under the undisputed circumstances, the

plaintiff, knowing the practice and custom of the defendant, and that such collisions were liable to take place thereby, and that it was a dangerous place to sleep in, in view of such practice of shoving cars upon the track and against this caboose-car, must be held to have accepted the risk of such collisions, and therefore has no cause of action on account of injuries received in consequence thereof. *Mich. Central R. R. Co. v. Austin,* 40 Mich. 247; *Richards v. Rough,* 53 Id. 212; *McGinnis v. Bridge Co.,* 49 Id. 466; *Swoboda v. Ward,* 40 Id. 420; *Lindstrand v. Lumber Co.,* 68 Id. 261.

The judgment of the lower court must be affirmed, with costs.

The other Justices concurred.