LYNCH *v.* SAGINAW VALLEY TRACTION CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—RISKS ASSUMED—
   CONDUCT OF BUSINESS.

   A master may conduct his business in his own way, and, un-
   less a servant wishes to assume the risks of such method as
   his master has adopted, he should refuse to enter upon the
   employment, or leave it upon discovering the method, and a
   servant, knowing the hazards of the employment as the busi-
   ness is conducted, cannot recover for injuries received, on
   the ground that there was a safer way of conducting the bus-
   iness, which, had it been adopted would have prevented the
   accident.

2. SAME—METHOD OF INSPECTION.

   An experienced lineman, in the employ of an electric railway
   company, who knew that it was the practice of the company
   to make no separate inspection of poles, but to rely upon such
   as the linemen should make when occasion required them to
   work upon them, and that all changes of and repairs upon
   poles were made by the crew, in which he participated, as-
   sumed the risk of injury resulting from the employer's
   method of inspection.

3. SAME—CUSTOM—EVIDENCE—ADMISSIBILITY.

   In an action by an electric lineman against his employer, an
   electric railway company, for personal injuries, based upon
   alleged negligence on the part of the company in failing to
   provide proper inspection of its poles, evidence that it was
   the universal custom of such railway companies to omit other
   inspection than that made by their repair crews, such as the
   crew with which plaintiff was working, was admissible on
   the question of assumption of risk.

Error to Saginaw; Gage (Chauncey H.), J. Submit-
ted January 24, 1908. (Docket No. 156.) Decided June
27, 1908.

Case by Edward Lynch against the Saginaw Valley
Traction Company for personal injuries. There was judg-
ment for plaintiff, and defendant brings error. Reversed,
and no new trial ordered.

*Weadock & Duffy*, for appellant.

*Crane & Crane*, for appellee.

HOOKER, J.   The plaintiff was injured by reason of the fall of a pole while at work thereon for the defendant. He recovered a judgment of $500 for injuries sustained, and the defendant has appealed.   The pole was one of 3,500 or more set about 15 years before the accident, to carry the span wires supporting the trolley wire of an electric railway.   They were set at the time the road was constructed by the defendant's vendor.   The negligence complained of is a failure to inspect.

The accident occurred under the following circumstances:   The foreman of the line crew directed the plaintiff and others of the crew to go to a certain street and raise the trolley wire to a height of 19 feet above the street.   To do this the "high wagon," as it is called, was driven under the span wires in succession, a man upon the wagon supporting the trolley wire upon his shoulder while the plaintiff climbed poles on each side, substituting for the old span wire a new one which he fastened to the poles at a proper and higher point than the old span wire had occupied.   Then the trolley wire was let down upon the new span wire and fastened, care being taken to avoid a sudden contact which would make an unnecessary and dangerous strain on the poles, the weight of the trolley wire at the point of contact being about 100 pounds, under the normal contact.   The plaintiff had climbed several poles, and the change had been successfully made at such points.   When the trolley wire was let down upon the next one, the weight was too much for the pole, and it broke below the ground and fell with plaintiff.   Examination showed that it was badly rotted below ground, within an outer shell of sound wood.   Above ground its exterior showed no signs of decay.

The defendant had owned the road about five years, and the evidence shows that it had never provided for any periodical and systematic, or, in fact, any general in-

spection of the poles to ascertain their condition, but had depended upon the linemen to repair or replace them when they should be discovered by them or reported by other employés to be broken. It is conclusively shown that the plaintiff and other linemen knew that such was the practice and that there was no other method of inspection.

Counsel offered to show that this was the universal practice on electric roads, but the testimony was excluded, and in his charge the judge instructed the jury as follows:

" I charge you that it was the duty of this company, so long a period of time having elapsed since the origin of the interurban system and the setting of these poles—that it was their duty to provide for their inspection in reference to the decay, and that the inspection should be by a class of men or man, so far experienced that they could report to them the condition of the wood itself, as to whether it was safe or not. If they omitted to do this, and it appears that they did nothing in that regard—that is the proof in the case—they failed to discharge a duty that they owed to this lineman in that connection when they gave the order to go to that point as a place to work."

This was to all intents and purposes equivalent to advising the jury that the defendant was negligent in not providing for the inspection of its poles by some one other than the line or high wagon crew.

A master may conduct his business in his own way. Unless a servant wishes to assume the risks of such method as his master has adopted, he should refuse to enter upon the employment, or should leave it on discovering the master's method of doing business. *Hawk* v. *Railway Co.* (Pa.), 11 Atl. 459.

A servant, knowing the hazards of his employment as the business is conducted by the master, cannot recover for injuries received, on the ground that there was a safer way for conducting the business, which, had it been adopted, would have prevented the accident. *Naylor* v. *Railway Co.*, 53 Wis. 664; *Schultz* v. *Railway Co.*, 31 N. W. 321 (67 Wis. 616). In a note to this case many

cases sustaining the rule will be found. See, also, *Hewitt* v. *Railroad Co.*, 67 Mich. 61; *Illick* v. *Railroad Co.*, 67 Mich. 632; *Cantwell* v. *Brennan & Co.*, 125 Mich. 349.

The undisputed proof shows that the plaintiff was an experienced lineman, that he knew that it was the practice of the company to make no separate inspection of poles, but to rely on such as the lineman should make when occasion required him to work upon them; that all changes of, and repairs upon, poles were made by the crew, in which he participated. He continued, if he did not accept, his employment, with full knowledge of these things, and he therefore assumed the risks attendant thereon. *Kohn* v. *McNulta*, 147 U. S. 238; *Tuttle* v. *Railway*, 122 U. S. 189; *Hickey* v. *Taaffee*, 105 N. Y. 26; *Gibson* v. *Railway Co.*, 63 N. Y. 449; *Chesapeake, etc., R. Co.* v. *Hennessey*, 38 C. C. A. 607; *Narramore* v. *Railway Co.*, 37 C. C. A. 499 (48 L. R. A. 68); *Birmingham Railway & Electric Co.* v. *Allen*, 99 Ala. 359 (20 L. R. A. 457); *Louisville, etc., R. Co.* v. *Frawley*, 110 Ind. 18; *Michigan Cent. R. Co.* v. *Austin*, 40 Mich. 247; *McGinnis* v. *Bridge Co.*, 49 Mich. 466; *Richards* v. *Rough*, 53 Mich. 212; *Jacobs* v. *Railway Co.*, 84 Mich. 299; *Journeaux* v. *E. H. Stafford Co.*, 122 Mich. 400. See, also, note to case, *Georgia Pacific R. Co.* v. *Dooley*, 12 L. R. A. 342 (86 Ga. 294).

Similar cases to the one now before us have often arisen. In *Cumberland Telephone Co.* v. *Loomis*, 87 Tenn. 504, it was held:

"A charge to the effect that a servant may assume that a telephone pole, which he is required to climb in due course of his employment, is safe and suitable for that purpose, is erroneous in a suit brought by the servant for injuries caused by the breaking of the pole, in that it relieves him from the exercise of ordinary care for his own safety, and decides that he was not the company's 'inspector' of poles—a disputed fact."

*McGorty* v. *Telephone Co.*, 69 Conn. 635, was a case much like this. The court said:

"We have no occasion, upon the facts found, to consider whether the foreman Phelps was a fellow-servant of the plaintiff, a question discussed in the briefs of counsel. The accident did not occur from the negligence of Phelps. It is true he directed the plaintiff to climb the pole, and in answer to the latter's inquiry truthfully said, as might any other lineman who had tested the pole for himself, that he had been up the pole, and expressed his opinion that it was safe. But the plaintiff knew that it was not a part of the duty of the foreman to instruct an experienced lineman as to the safety of a pole he was about to climb; and from the facts found we must assume that although he knew that in obedience to the order of the foreman he was required to do the work upon the pole, yet he was to rely upon his own judgment in determining whether it was safe to climb it without testing it or supporting it, and that it was his right to secure the pole before climbing it if he doubted its safety.

"It cannot be laid down as a proposition of law, as seems to be claimed by plaintiff's counsel, that the linemen of telegraph and telephone companies have a right to rely upon the soundness and safety of the poles upon which they are working, and that it is the duty of such companies to inspect and test poles and support such as are insecure, before permitting their linemen to climb them. Whether it is incumbent upon the master or the servant to perform such a duty is usually a question of fact depending upon the terms of the contract of employment, the servant's knowledge of the hazards of the work in which he is engaged, his ability and opportunity to discover the dangers to which he is exposed and to avoid them, and upon other circumstances. Employers have a right to decide how their work shall be performed, and may employ men to work with dangerous implements, and in unsafe places, without incurring liability for injuries sustained by workmen who knew or ought to have known the hazards of the service which they have chosen to enter. *Hayden* v. *Manufacturing Co.*, 29 Conn. 548; *Dixon* v. *Telegraph Co.*, 68 Fed. 630; *Greene* v. *Telegraph Co.*, 72 Fed. 250; *Flood* v. *Telegraph Co.*, 131 N. Y. 603; *Cumberland Telephone Co.* v. *Loomis*, 87 Tenn. 504."

See, also, *Tanner* v. *Railroad Co.*, 180 Mass. 572, and *Sias* v. *Lighting Co.*, 73 Vt. 35.

In *McIsaac* v. *Lighting Co.*, 172 Mass. 89, it is said:

" The plaintiff contends that the defendant was guilty of negligence in failing to ascertain whether the pole was sound and strong, or to take other precautions for his safety.

" The plaintiff was directed to go and take down from the pole the two wires upon it which belonged to the defendant, and to put them on a new pole near by, which had been erected on account of a change of grade in a railroad at a crossing. He went alone to do the work, using a horse and wagon belonging to the defendant to carry such tools and materials as he thought he needed. He was a man of experience in this kind of business, and the method of doing the work he seems to have determined for himself. The pole was of chestnut wood, about 8 inches in diameter at the top, and about 14 inches at the surface of the ground. It had been set between eight and nine years, and the evidence tended to prove that it showed no weakness or sign of decay above the ground.

" A fundamental question is whether the defendant owed to a lineman, whose business it was to work upon poles all along the line, as occasion might require, the duty to inspect its poles below the ground, and inform the linemen whenever any of them were so decayed as to be unsafe to work upon. The plaintiff admitted in his testimony that he knew that the life of a pole was limited, and that any pole after a time would become unsafe. He had worked upon poles in the construction and repair of electric lines many years. When he engaged to work for the defendant he knew it would be his duty to go upon poles that had been set in the ground an uncertain length of time. He must have known that the work of climbing poles and taking down and putting up wires would often put a strain upon a pole much greater than it would be exposed to in sustaining wires when they were all in their proper positions. He must have known that it would be inexpedient and impracticable to have a man or company of men to go and examine each pole upon which a lineman was about to work, to see whether it would sustain the strain which the work would put upon it. The evidence was undisputed that it was easy to determine very quickly whether a pole was badly decayed a little below the surface of the ground, and that no skill or experience was required to do it beyond that which was possessed by ordinary linemen. The plaintiff testified that there were

risks about the business with which he was familiar as a lineman. We think that one of the most common and obvious of these, in reference to which both he and his employer must have been presumed to have contracted when he entered the defendant's service, was the risk that some pole of uncertain age might break and fall when a lineman was working upon it, if he did not take measures to ascertain its condition, before going upon it. All the evidence tends to show that, in the ordinary course of the business, the linemen, who are often expected to work alone without supervision, as the plaintiff was working at the time of the accident, would examine the poles for themselves, so far as they considered it necessary to do so for their safety. They easily could make any necessary tests to ascertain the condition of the poles as to soundness, without the aid of special inspectors, and from their knowledge of common affairs could judge whether the pole was safe to go upon. The plaintiff testified that there were pike poles belonging to the defendant at the shed from which he started with the horse and wagon, and that he was familiar with the use of pike poles in setting new poles and bracing up old ones, and there is nothing to show that he might not have taken some of them to use in the work if he had chosen to.

"The burden was upon him to show that the defendant's neglect of some duty caused the accident. We are of opinion that there is no evidence that the risk of falling on account of the weakness of old poles was not a risk of the business, which the plaintiff assumed by his contract to work upon such poles. As between the plaintiff and the defendant, the defendant was under no obligation to inspect the poles to see whether they were decayed, and there was, therefore, no evidence of negligence on the part of the defendant."

In *Britton* v. *Telephone Co.*, 131 Fed. 844, Lurton, J., said:

"We see no reason why a lineman, in view of the peculiar character of his work, may not lawfully contract to do any inspecting or testing reasonably necessary to determine whether he can safely climb a particular pole for the purpose of adjusting, transposing, or placing new wires. His acceptance of service with knowledge of the way in which the company conducts this part of its business, whether that way be the safest way for him or not,

would imply an assumption of the risks incident to that mode of carrying on its work. Linemen must, in the very nature of the occupation, be often required to work alone, or in association with another lineman, and it would seem quite impracticable and unreasonable to send one man as an inspector with another of equal fitness to test a pole before climbed by the latter. The case might be altogether different if skill of a kind not presumably required from a lineman in the usual course of his calling was necessary to apply the tests reasonably sufficient in such cases. The tests which the plaintiff's evidence shows to be customarily used are by shaking, by pushing against the pole by means of a long staff with a point at one end, and by throwing away the dirt next the surface at the base of the pole and examining by use of an axe or crowbar the soundness of the pole at that point. These tests are all simple, and quite within the range of the experience of a qualified lineman, as shown by the evidence in this case. The experience of any such lineman would advise him that the life of a pole varies with climate, soil, and character of the wood. The same experience would warn him of the danger of putting the strain incident to climbing and removing or adjusting wire upon a pole of uncertain age, for a pole may well stand under the support of wires extending from one pole to another which will not stand under the weight of a man with the tension of the wires removed. That he should be held to assume the risks incident to climbing after making such examination and tests as his own experience and judgment should indicate were necessary, is not inconsistent with the fair implications arising from his acceptance of employment. * * *

" The principle applicable in such cases is that, by continuing in the service with knowledge of the manner in which that business is conducted, the servant agrees that the dangers obviously incident to the discharge of his duties, when he is expected to determine for himself the safety of a particular pole before climbing, shall constitute a term of the contract of employment. This is the doctrine of assumption of risk as many times expounded by this and other courts."

The court erred in excluding testimony offered to show that it was the universal custom of such railroad companies to omit other inspection than that made by the repair

crew, and it was also error to instruct the jury that such omissions constituted negligence. Under the undisputed proof and the broad admissions of the plaintiff himself, the court should have directed a verdict for the defendant.

The judgment is reversed, and no new trial will be ordered. The defendant will recover costs of both courts.

GRANT, C. J., and OSTRANDER and CARPENTER, JJ., concurred. MONTGOMERY, J., concurred in the result.