MELLISH *v.* PERE MARQUETTE RAILROAD CO.

1. MASTER AND SERVANT—RAILROAD CROSSINGS—STATUTES — SIGNALS.

  Under 2 Comp. Laws, § 6232, which provides for the installation of safeguards ordered by the board of railroad crossings at the time of authorizing intersecting railroads to cross at grade, only those to whom the duty is due and who have sustained injuries of the character its discharge was intended to prevent can complain of a failure to comply with such order.

2. SAME.

  And an engineer whose train collided with another locomotive on the same track is not entitled to maintain an action for negligence, against his employer, for the removal of an interlocker system installed at a railroad intersection under the order of such board, since the order was designed only to protect trains from collision in crossing on the different tracks not from collisions on the same line in the vicinity of the intersection.

3. SAME—NEGLIGENCE—FELLOW-SERVANT.

  It was not negligent for a locomotive from defendant's line to be upon an intersecting branch line, in the path of the train approaching on such branch line near the crossing, at which defendant's rules provided that freight trains of the class involved must approach side tracks, water tanks and fuel stations under control, expecting to find a train at the point, and failure to send out a flagman, from the stationary

locomotive, as provided by another rule, was negligence of a fellow-servant.[1]

4. SAME—SYSTEM—ASSUMPTION OF RISK,
   The engineer, knowing the dangers attending the use of defendant's signal system, which it was claimed was faulty in giving him the signal for right of way although another train was in his path, must be deemed to have assumed the risk.

Error to Bay; Collins, J. Submitted April 11, 1911. (Docket No. 72.) Decided October 2, 1911.

Case by Flora Mellish, as administratrix of the estate of Nicholas George Mellish, deceased, for the wrongful death of plaintiff's intestate. Judgment for plaintiff. Defendant brings error. Reversed.

*Bills, Streeter & Parker* (*Weadock & Weadock* and *Weadock & Duffy,* of counsel), for appellant.

*Floyd A. Wilson* (*James H. Davitt* and *De Vere Hall,* of counsel), for appellee.

BLAIR, J. This action arises out of an accident which occurred at Baldwin, Lake county, Mich., on March 14, 1905, in which plaintiff's intestate, an engineer in the employ of defendant's predecessor, was instantly killed.

In 1889, the Flint & Pere Marquette Railroad ran from Ludington and Manistee to Saginaw, passing through Baldwin. The Chicago & West Michigan Railroad Company made application to cross the tracks of the Flint & Pere Marquette Railroad at grade, and, in July, 1889, the board of railroad crossings made an order that the crossing should be made at grade, and that an interlocking and derailing switch and signal appliance, to be thereafter approved by the commissioner of railroads before the same was adopted for use, be procured and erected by the Chicago & West Michigan Company, and thereafter efficiently maintained and operated at the joint and equal expense of

[1] Common employment, apart from statute, where there is no question of vice principalship, see note in 50 L. R. A. 417.

both companies. This interlocking and derailing switch and signal appliance was duly installed and approved by an order of the commissioner of railroads on November 22, 1889. This order of approval was modified, at the request of both of the companies, by the commissioner of railroads on March 25, 1896; the wire connections of all distance signals being ordered dispensed with, and each of the distance signals disconnected from its lever and permanently fixed in a position indicating caution. From that time up to the time of the accident, there were no other or further orders made regarding this crossing or the appliances thereat by the board of railroad crossings or the commissioner of railroads. The appliance so installed consisted of (a) derails, about 250 to 300 feet on each side of the crossing; (b) the home signal, about 50 feet outside the derails; (c) the four distance signals; the one at the west, the only one material to the issue in this case, being 2,064.9 feet from the crossing.

The two railroads mentioned were consolidated in 1900. The interlocker was taken out on June 25, 1903, without any order from, or authority of, the railroad crossing board or the commissioner of railroads. It was discontinued and done away with, and the home and distance semaphores and the derails were removed and taken out entirely, and an ordinary diamond crossing installed in its place. The defendant installed over the southwest corner of the diamond a target on a pole 20 to 25 feet high; such pole being about 9 feet from the center of each main line track. This target was operated by the target man in the tower. At first a T target with two red lights was placed on this pole, and later, on January 1, 1905, a two-bladed crossing signal was installed in place thereof, which, at the time of the accident, was operated at night by means of red and white lights; a red light indicating stop, that a train had no right to cross the diamond, and a white light indicating proceed, that a train had the right to cross. This light was 25 feet 4½ inches above the rail.

West of the diamond, 610.6 feet on the north side of the

Ludington main line, is a coal dock, or hoist.   Engines could take coal from the south side of this coal dock on the Ludington main line, or from the north side of the dock, when standing on the northwest wye, ` without going on the Ludington main line.   On the south side of the Ludington division main line, 529.4 feet west from the crossing, was a standpipe 6 feet south of the south rail. There was also a standpipe on the Petoskey division south of the crossing.   This was east of the Petoskey main line, and was situated between the main line and the side track, or wye.   Petoskey division engines could obtain water at this standpipe on their own line without being . on the Ludington main line.

After the coal dock was built, it was the general practice for Petoskey division engines to go over on the main line of the Ludington division and take coal and water, as well as taking coal on the northwest wye and water at the standpipe on their own division, without coming onto the Ludington main line.   The freighthouse was in the southeast corner of the diamond.   The target house, from which this crossing signal was operated, was in the corner of the freighthouse next to the diamond, in the southeast corner.   The order board at Baldwin was situated at the target house, east of the diamond.

There was a snowbank on the south side of the track, extending east and west from the standpipe, around which a path had been shoveled.   The bank extended about 15 feet east of the standpipe.   It began at the end of the ties, about 16 or 18 inches from the rail, and sloped up gradually; the highest point being about four feet from the south rail.   At the deepest point, this bank was estimated by various witnesses as being from $2\frac{1}{2}$ to 4 feet deep.   The bank was highest around the standpipe, and there ice had formed on its surface on account of the dripping from the pipe.   There was a similar bank west of the pipe.   This bank had been there since the early part of the winter.

About 4 o'clock on the morning of the accident, two engines were standing in the vicinity of the coal dock,

both having taken coal.   Engine 166 was on the south-
west wye about opposite the coal dock, standing with its
headlight toward the west.     Engine 186, which had
brought a train from Petoskey, had worked in the eastern
part of the yard and come west to the coal dock along the
Ludington main line, and was standing near the water-
spout.   The weather was, in the language of the wit-
nesses, "muggy, dull, and heavy—a bad night; and the
smoke of the engines tended to settle to the ground."   The
plaintiff's testimony tended to show that her intestate ap-
proached the crossing from the west with his engine under
control.   When Mr. Mellish's train was a very short dis-
tance west of the coal dock, the head brakeman and the
fireman saw the headlight of engine 186 in front of them.
At that instant, according to the plaintiff's testimony,
Mr. Mellish applied his emergency brake and did all that
he could to stop his train.   He was unable to stop it, how-
ever, until it had gone an engine length and a car length
over the intersection, and had collided on the way with
engine 186, inflicting considerable damage on both en-
gines.   The testimony was that the engines collided at a
point between the waterspout and the intersection.   When
the engines stopped, engine 334 was found to be derailed,
and Mr. Mellish's body was found under the train at the
intersection.   It does not appear how, or exactly when,
he left his engine, or whether he fell or jumped; but from
the marks on the snow and traces of blood along the track
the plaintiff claimed the right to go to the jury on the
theory that after he had done all he could to stop his train
he jumped from his engine, struck the snowbank near the
standpipe, and rolled back under the wheels.   The testi-
mony as to the speed at which he was going when he
passed the coal dock and struck the other engine is stated
by various witnesses at from 6 to 18 miles an hour.   Mr.
Mellish was familiar with the Baldwin yards, having run
through them as an engineer for many years, having been
through them 161 times in the preceding year, and hav-

ing switched in the yards 74 times during the same period.

The trial court submitted the case to the jury for their consideration upon two principal grounds of negligence on the part of defendant, stated to be the negligence relied upon by plaintiff, viz., first, the unlawful removal of the interlocking plant, substituting therefor an ordinary diamond with a single signal. The second claim is stated by the court as follows:

"A second claim of plaintiff is that after wrongfully removing such interlocking and derailing switch and signal system, defendant carelessly and negligently failed and omitted to install any mechanical device, or to provide for any notice or warning to train employés on its Ludington division, approaching from the west at night, of the presence on the main line at said coal shed or waterspout of engines from its Petoskey division, when taking coal or water thereat; but, on the contrary, that its semaphore or target system employed at the time of the death of Mr. Mellish was such that, when so approaching with his engine at night, the signal given Mr. Mellish, when given, indicated to him that the track on which he was approaching, between his engine and the diamond, was clear of engines, cars, and trains, when in fact it might be occupied by an engine from said Petoskey division for the purpose stated; and the claim made by plaintiff hereunder is that a system so misleading in fact was careless and negligent in its operation and effect, and that, as Mr. Mellish did so approach with his engine on the morning in question, such semaphore or target did show clear, as entitling him to the right of way over said track to the diamond, while in fact such right of way was obstructed by said engine from the Petoskey division so standing, and that such system being so careless, negligent, and misleading in its operation and effect that this was another cause of the death of Mr. Mellish, contributing and co-operating with the unlawful removal of such interlocking and derailing switch and signal system."

The jury returned a verdict for plaintiff, and defendant brings the case to this court for review.

1. The court instructed the jury (*a*) that it was negli- .

gence, as a matter of law, to remove the interlocking system; (b) that—

" It is the claim of plaintiff that the interlocking and derailing switch and signal system so installed, approved, and thereafter modified by said order of the commissioner of railroads, on March 25, 1896, when properly employed and operated, would have been of an aid and assistance in notifying and warning Mr. Mellish and the co-workers on his engine and train of the presence of engine 186 at or near the waterspout in time to have avoided the collision, and that if it had not been so removed such collision would have been averted; if you find this to be true, then you may say that the unlawful removal was the proximate cause of the death of Mr. Mellish."

The legal effect upon plaintiff's rights of defendant's action in removing the interlocking system constitutes the crucial question in the case.   Disregarding other serious questions raised by counsel for defendant, we are of the opinion that the accident in question was not within the purview of the statute, and its violation was not the violation of a duty owed to persons in the deceased engineer's situation.

. The order in this case was made upon application to the railroad crossing board, in accordance with the provisions of section 6232, 2 Comp. Laws, which provides, among other things, as follows:

" And at the time of approving said map said board may determine the place where and the manner in which said crossing shall be made, whether at grade or otherwise, and if at grade, what safeguards shall be provided by the company desiring to make such crossing *to protect against accidents thereat.*

The order of the board, of which the railroad commissioner was a member, was in part as follows:

"That for the *protection of said crossing* against the danger of accident *from collisions thereat,* the said Chicago & West Michigan Railway Company should at its own proper cost and expense procure and erect at said crossing an interlocking and derailing switch and signal appliance, to be approved by the commissioner of railroads before

the same shall be adopted for use, and after such approval to be thereafter efficiently operated and maintained at the joint and equal expense and cost of each of the said Chicago & West Michigan Railway and Flint & Pere Marquette Railroad Companies, unless otherwise agreed by and between said companies respectively."

The order of the commissioner, after reciting full compliance by the railroad with the order of the board, proceeds:

"And being satisfied from a personal inspection of the same that the use of the safety device constructed by the said Chicago & West Michigan Railway Company and now ready for operation *will insure the safety of trains at said crossing* without the necessity of the same being brought to a full stop before going thereupon, as is required by the provisions of Act 198, Session Laws of 1873, and the several acts amendatory thereof. Now, therefore, by virtue of the authority in me vested by the several statutes of the State of Michigan in such case made and provided, I do hereby authorize and permit the engines and trains employed in the traffic of your said roads respectively on and after the hour of 7 o'clock a. m. of Monday, the second day of December, A. D. 1889, to pass over said crossing without the necessity of said engines or trains being brought to a full stop," etc.

" In approaching said crossing, the speed of your engines and trains will not exceed at the home signal on either side thereof, for passenger trains, twelve miles, and for wild engines or freight trains, eight miles per hour, and will not be increased until the entire train has left the crossing."

The statute, the order of the crossing board, and of the railroad commissioner contemplate protection at the crossing of intersecting railroad tracks against collisions of trains upon such tracks, and not against collision of trains upon the same railroad track, whether near to or far from the crossing. This being the case, "those only to whom the duty is due and who have sustained injuries of the character its discharge was designed to prevent, can maintain actions upon it." *Chicago, etc., R. Co.* v. *Railway Co.*, 176 Fed. 237, 100 C. C. A. 41; *Gorris* v.

*Scott,* 9 Exch. (L. R.) 125. The principle upon which the rule rests is so clearly expounded in *Gorris* v. *Scott, supra,* that we content ourselves with a reference to the opinions of the judges therein for further elucidation thereof. It results that, since the defendant owed no duty to plaintiff's intestate to maintain an interlocking system to protect him against any other injuries than those due to collisions with trains on the intersecting road, its removal of such system was not actionable negligence under the circumstances of this case; but such negligence must be predicated upon other grounds.

2. Plaintiff's intestate was thoroughly familiar with the situation at Baldwin, including the signal system in use after the removal of the interlocking system. His train was an extra third-class freight train. Rule 91*c* of the company is as follows:

"91*c*. All extra and delayed third-class freight trains must pass into and through all stations, and must approach side tracks, water tanks and fuel stations with train under control, expecting to find a train at such point. Speed must be reduced so that it shall not be possible to strike any train that may be within the station switches or that may be taking fuel or water. In such cases the responsibility for safety rests on the approaching train. When fog, snow, darkness, dangerous places or other circumstances render it necessary, a train occupying main track at a station must, as an additional precaution, be protected as per Rule 99. This will not, however, relieve the approaching train of responsibility for accident."

Under this rule, it was not negligent for the locomotive No. 186, to be at the coal dock or water tank, and the failure to send out a flagman as required by Rule 99 was the negligence of a fellow-servant, which Mr. Mellish was warned he must anticipate. In view of Rule 91*c*, the defendant was not guilty of actionable negligence in permitting its locomotives to take fuel and water upon the Ludington track, without other warning to approaching trains than the rules provided for. *Enright* v. *Railway Co.,* 93 Mich. 409 (53 N. W. 536); *Whalen* v. *Railroad*

*Co.*, 114 Mich. 512 ( 72 N. W. 323 ); *Moyer v. Railroad Co.*, 159 Mich. 645 (124 N. W. 542).

So far as the character of the signal system was concerned, if it was faulty, which we do not determine, Mr. Mellish was fully acquainted with the dangers attending its use, and must be deemed to have assumed the risk thereof. *Lynch* v. *Traction Co.*, 153 Mich. 174 (116 N. W. 983, 21 L. R. A. [N. S. ] 774).

The judgment is reversed, and a new trial ordered.

OSTRANDER, C. J., and BIRD, BROOKE, and STONE, JJ., concurred.