## KILL v. SUMMITT DRILLING CO.

No. 20495. Opinion Filed July 28, 1931.

Rehearing Denied Nov. 24, 1931.

Davidson & Williams, for plaintiff in error.

N. A. Gibson, A. B. Honnold, George C. Abernathy, and West, Gibson, Sherman, Davidson & Hull, for defendant in error.

KORNEGAY, J. This action originated in the district court of Pottawatomie county by the filing of a petition on February 25, 1928, on behalf of Vesta Kill, the widow, and the minor children of herself and John N. Kill, her husband, to recover damages for his death, alleged to have occurred on the 28th of December, 1927, while he was engaged in work as a driller on behalf of the defendant company on an oil and gas well in Pottawatomie county, Okla.

There was a charge that the atmosphere had become heavily saturated with oil and

198

gas, and especially gas, in the vicinity of the well, arising from the fact that the air was moisture laden, and on December 28, 1928, there was a flow of oil and gas therefrom, which caught on fire and exploded, and that the catching of the gas and oil on fire was brought about by the negligence of the defendant, the first particular negligence being that the boiler, by which the drilling machinery was operated, was in too close proximity to the well, that it was approximately 50 to 75 feet from the well. The charge is that when the pay sand was reached, and before drilling in, it was the duty of the defendant to remove or set the boiler back a safe distance from the well in order to avoid the danger arising from the fires in the boiler. The distance required is not set out in the petition.

The second particular negligence was that the defendant knew that the air for a considerable distance around the well was heavily laden with oil and gas, and was of great danger to all persons in and about the well, and that the defendant did not put out the fire in the boiler, nor in any wise control or render safe the flow of oil and gas. There was a further statement that at the time of the explosion, resulting in the burning to death of the husband and father, gas and oil, and especially gas, was pouring in large quantities from the well and impregnating all the air at the well and near the well and in the vicinity of the well with oil and gas. There was a further charge that it was the duty of the defendant to have turned off the fire in the boiler and to have cooled off the boiler when the gas and oil began to flow from the well "at the time indicated at the time of the accident."

There was a further statement that there were 15 or 20 large bricks in the boiler that were red hot at the time the gas and oil caught fire. The plaintiff further says that the oil and gas that began to flow immediately prior to the explosion saturated the air near the well. She further charges that it was the duty of the defendant to have turned out the fire before the oil and gas began to flow, and cooled off the bricks so that they would not be hot enough to set fire to the gas.

A specific allegation of negligence is as follows:

"She says that the defendant was guilty of gross negligence in that they did not turn out the fire in the boiler nor did they cool the bricks in the boiler."

The plaintiff says that said escaping gas and oil, and especially gas, caught fire from the boiler, and the explosion followed as a result of it. She avers that the defendant was guilty of carelessness and negligence in that they did not furnish her husband a safe place in which to work, and the place was unsafe for the reasons hereinabove indicated. There were further allegations to show the expectancy of the deceased, and the family relations, and the lack of finances, alleging that the explosion occurred on the 28th of December, 1927, and that the deceased died on the 30th of December, 1927. There was a prayer for $75,000 actual damages, and $25,000 punitive damages.

An answer was filed admitting the relationship between the plaintiffs and the deceased, and that the deceased was employed as a driller, and his death. There was a denial of any negligence or wrongful act. There was a further charge to the effect that the deceased was the driller in charge of the drilling and of all the operations about the well at the time of the injury complained of which are alleged to have resulted in death. That he was a vice principal and that it was his duty to supervise and superintend the work and to take all the steps necessary to protect himself and the other men engaged at and about the drilling of the well. There was a further statement that if there was any negligence, it was the negligence of the deceased and was not chargeable to or attributable to the defendant. There was a further statement that John N. Kill was experienced in the drilling of oil and gas wells, and familiar with all the dangers thereto, and that he knowingly assumed each and every risk attendant upon the drilling of said well. There was a general denial.

A reply was filed by the plaintiff denying each and every allegation of the defendant's answer except such as admitted allegations of the petition.

With the issues so made, plaintiff made an opening statement contending that the boiler was too close to the well and that there should have been some means there to put out the fire, and the further contention that the bricks were a "live flame, so to speak," and the boiler was still hot and that the oil and gas caught from it, and that there should have been water or a steam pipe to put the fire out.

The defendant below made an opening statement to the effect that on the admitted facts there should be no verdict for the plaintiff. There was a statement that the boiler had been moved back 75 feet, and was approximately 150 feet in accordance with the custom of the field, and this was a

proper and safe distance under the experience of men who have devoted their entire life in drilling oil wells in Oklahoma and other fields. The term "towers" was defined, and it was explained that the driller was the boss of the job during the time he was on. It was claimed that the deceased was an experienced man and had had long experience as a tool dresser before he became a driller. He was considered by the employers as the very best of men, and knew all about what should be done and knew how to take care of himself and the job. That he was working with a man by the name of McGee, who was a tool dresser. There was a further statement that there had not been any appreciable flow of gas or oil from the well for 24 hours before the accident occurred. That the casing crew was putting down a casing on the inside of the 8-inch casing preparatory to drilling through to a deeper depth to what they considered to be the oil producing sand. That while they were putting in a braden head, the explosion occurred, the parties engaged being a roustabout of the Prairie Oil & Gas Company and the driller and the tool dresser. There was a claim that the gas came up suddenly and the driller told the tool dresser to go down and turn out the gas in the boiler. That fearing that there might be some break or short in the electric wiring, the tool dresser went down to turn off the generator. There was a further claim that the deceased and Galey were working at the braden head, while McGee went down to turn off the generator. There was a further statement that it was the custom in the field to have a bucket of water for the purpose of cooling down the brick and creating a steam in the boiler. That there was a bucket of water there for that purpose. There was a further claim that the men were experienced and took their chances and suffered the consequences. After this opening, the testimony began.

At the conclusion of the evidence on the part of the plaintiff, a demurrer was sustained to plaintiff's testimony after argument. and cause dismissed at cost of plaintiff, followed by motion for new trial, its overruling and the case being brought here. We have examined, therefore, the entire evidence, and compared it with the statements and arguments in the briefs. From the evidence. it reasonably appears that the explosion started in the fire box of the boiler. As to the exact cause, it is a matter largely of conjecture, as between superheated brick, a hot boiler, or a possible flame left by reason of failure to completely turn off the gas, though the parties evidently tried the case

on the supposition of the hot boiler and bricks causing the gas to ignite.

The first witness was R. J. McGee, the coworker with the deceased, and the only person with the deceased on the ground at the time of the accident, that was in the employ of defendant in error. Both the driller and his helper, the tool dresser, McGee, were men of large experience in oil and gas well work, and were thoroughly familiar with conditions in the field when the accident occurred. They had been working for six days together on the well, running tower from 12 noon to midnight. They had known each other for four months. The tool dresser McGee, testified from pages 27 to 58 (C.-M.). Alvin Galey, a pumper of the Prairie Oil & Gas Company, testified from pages 60 to 74. Frank Hull, a member of the Independent Casing Crew, testified, pages 79 to 87. Glen E. Cole, a driller, testified from page 87 to page 95. Joel A. Wolfe, a stockholder in defendant company, testified from page 98 to 103. Frank Hull again testified at page 104. At this stage a demurrer to the evidence was interposed, but the case was reopened for further testimony (C.-M. 107). Mrs. Pearl Ramsey, the mother of Mrs. Kill, testified on page 110 to page 116. She detailed some conversation between deceased and a Mr. Creekmore. At page 112 the following appears:

"A. The door was at the foot of the bed, and she says, 'Johnnie, here is Bill to see you,' and John raised up his head and looked and said, 'Hello, Bill,' and raised up in bed and raised his hand up and shook hands. So they talked a minute about how he felt and everything, and John said, 'Bill, I want to tell you that boiler was too close to the rig, and,' he says, 'the burner wasn't right, and,' he says, 'the boiler should have been moved back in this particular case,' and Bill says, 'Yes; I know it, Johnnie, but it is too late now,' and he says, 'Well, I am telling you,' and he kind of raised up and kind of waved his arm—John had an awful habit of waving his hands and arms in the air—and he waived his arms in the air and said, 'Bill, I want to tell you,' and Bill said, 'Hush, hush, Johnnie, that is all right,' but he said, 'I mean to see that boiler is moved back and the burner—the burner isn't safe—I don't want any other poor devil to be burned like I am and for safety sake move it back.' and Bill said, 'We can't now, and don't say no more,' and Johnnie said. 'Bill, I want to tell you I mean to see it is moved back,' and waved his arms in the air, and kept telling him he wanted him to see it didn't happen to any one else, and he said, 'You know the boiler wasn't safe,' and Creekmore said, 'I know it, but we can't help that now.' Q. That was the conversation in substance? A. Yes, sir."

200

Thomas A. Creekmore was introduced, at page 117, and testified that he did not think Kill was "at himself" when the talk was had, and on page 119 gave his version, as follows:

"The Witness: I was told Kill was dying, and naturally I was agitated. He said, 'Bill, this is the second rig we have burned down for you, old man, and I am sure sorry,' and I said, 'John, don't worry about those tools; we can replace them; just get well.' Dr. Carson told me—Mr. Williams: I object to what Dr. Carson said. The Court: Sustained. The Witness: He wasn't rational, and he talked about the well, and he said, 'No S. B. was smoking any cigarets either,' and he said, 'I think it caught from the boiler.' He said, 'I think it caught from those damned bricks,' and I said, 'John, let's don't worry anymore about the well and the tools; just think about yourself and get well.' He said, 'I will; I am not burned near as bad as those other fellows, and I am going to get along all right.' That is all I remember about it. Q. By Mr. Gibson: Is that all that took place in reference to it? A. Yes, sir. Q. What were your relations with him, friendly or otherwise? A. I was very fond of John Kill. Mr. Gibson: That is all. Mr. Williams: Now, I move to strike all this witness' cross-examination, on the ground the same is not proper cross-examination, and ask the court to instruct the jury not to consider it. The Court: Overruled. Mr. Williams: We except. (Witness excused.)"

The case was then submitted and the demurrer sustained. The motion for new trial, and assignments of error are broad enough to cover errors in the admission of evidence, but there does not seem to be any insistence in the brief on errors on that account; the brief standing on the proposition of liability on the evidence, and the sustaining of the demurrer. We so treat the matter.

The undisputed evidence, and the admitted facts, show that the deceased and his helper, McGee, were as prudent and experienced persons as could be found by the drilling company to drill the well, and they were in charge at the time of the accident; and at the time the flow of gas became dangerous. It further shows that the deceased in looking after the well and the tools of his employer, and to protect them, evidently did all his judgment told him was necessary, and did the same for his own safety. The same way with reference to his colaborer, McGee. The evidence further shows that, notwithstanding this, the accident happened. Of course, after a thing happens, one can look back and calculate how it could have been prevented, possibly.

In the testimony of witness McGee, at page 46, is the following:

"Q. Did Kill ever give you any instructions? A. Nothing more than just the ordinary routine of the well. Q. He gave you the routine instructions during the tower upon which you and he were working? A. Yes, sir. Q. He was your immediate superior? A. He was."

And at page 49, he testifies as follows:

"Q. Did Kill go anywhere near the boiler during those six days? A. Yes; I believe the second day I was there we changed water pumps. Q. By Mr. Williams: I don't understand that. What date was that? A. I believe the second day. Just shortly after we went out there. Q. By Mr. Gibson: Where was the water pump located? A. Right beside the boiler, the platform. Q. What do you mean by the changing? A. The one pump had gone bad and we installed a new pump for water supply. Q. During that time, during the six days which you and Kill worked there, did you and he install any provision for putting out the fire in the event it should be necessary to put the water or steam or anything else on it? A. We did not. Q. Why didn't you do that? A. Well, I don't know. Perhaps it hadn't entered my mind the occasion demanded it particularly out there. Q. In other words, there wasn't anything to indicate to either you or Kill there was any dangerous situation which would require provision for putting out the fire, was there? A. Not at that particular time. Q. And there wasn't until just a few minutes before this explosion occurred? A. No, sir. Q. Now, when you first became alarmed and saw for the first time that there was a condition which might be dangerous was about 15 minutes before the explosion? A. Ten or 15 minutes. Q. Did you and Kill have any discussion about turning out the fire? A. Not that I recall. He might have suggested it, or Galey might have, or I might have gone out of my own accord. Q. Galey was the pumper for the Prairie? A. Yes, sir. Q. He wasn't employed by the Summitt? A. He was not. Q. Whether it was told to you or whether from your experience you knew it was good sense, you went down and turned off the gas? A. Yes, sir."

At pages 54 and 55 appears the following:

"Q. Then, what did you do? A. Well, then, the well had begun to spray by that time quite a lot more, and we backed the elevators down to the casing support, down pretty close to the floor, and John threw some boards over it—Q. Threw some boards over what? A. Over the cellar, the hole in the derrick floor, and by that time it was spraying quite a lot harder, and John ran into the dog house, and of course at that time I went back out to the boiler to cut the lights out in the generator. Q. How did you happen to go back out to the boiler to

turn the lights out? A. That was just a natural precaution at that time. Q. From the presence of this spraying oil and the gas with it, you conceived the idea the lights might possibly ignite the gas? A. Yes, sir. Q. What quantity of oil, or amount of oil, would you say was spraying, Mr. McGee? A. That would be pretty hard to estimate. Q. The gas was the principal thing? A. There was a tremendous gas flow at that time. Q. You weren't afraid of the oil being ignited; it was the gas? A. I was afraid of both of them. Q. There wasn't anything—A. It is not so much the quantity of oil, but the gas pressure there with the oil. Q. How far was the oil flowing out from the well? A. I couldn't tell. Q. It was all dark? A. I couldn't tell. Q. When you turned these lights out, everything was very dark there, was it not? A. Yes, sir. However, I waited to turn the lights out until John and Galey—Q. Had come away from the well? A. John had got out of the dog house and got up on the walk to the engine house, and I cut the lights out. Q. You could see they were then in a place you thought was safe, and then you turned off the lights? A. Yes, sir. Q. How did you shut them off? A. Just shut the throttle."

And on page 57:

"Q. In reality, McGee, what I am trying to get is, you didn't really feel there was such imminent danger as to necessitate your pouring water on those bricks, did you? A. No; I didn't at the time. Q. Otherwise, you wouldn't have taken the risk of your own and his life? A. No; we would none of us have been there. Q. You were acting in the ordinary course of affairs, and did what you thought was right under the circumstances? A. Absolutely. Q. And you and he were both experienced men, and knew what it took to be done in cases of emergency of that kind, didn't you? A. Yes, sir."

As to the condition of the well, Alvin Galey, on page 61, testified as follows:

"Q. Did you see that well flow any? A. Yes, sir. Q. When did it begin to flow, if you know? A. I don't know. I couldn't say just exactly what date. Q. Did it flow about the time it came in? A. Well, just a day or two afterwards, anyway. Q. Then, after that time, after it came in, how frequently did it flow? A. Generally about every 24 hours. Q. Once every 24 hours? A. Yes, sir. Q. What kind of flow did it make? A. I couldn't say. It flowed about 85 barrels. Q. Was there much gas in it? A. Well, no; there wasn't much gas in the well. It would just come up a head and then flow. Q. It flowed about 85 barrels of oil every 24 hours, in about how many minutes? A. I don't know. Q. Give me an estimate. A. I would say 25 or 30 minutes. Q. Were you there on the 27th day of December, 1927? A. Yes, sir. Q. Did you see

the casing crew there? A. Yes, sir. Q. What were they doing that day? A. Running casing. Q. Were you there that morning? A. Yes, sir. Q. Were you there in the afternoon? A. Yes, sir. Q. They didn't run at night? A. No, sir. Q. Do you know why? A. They thought it was dangerous to run of a night. Q. What kind of casing did they run on the 27th, if you know? A. Five-inch. Q. Now, there were two strings of casing in that well? A. Yes, sir. Q. One of 8-inch and one of 5-inch? A. They were running the 5-inch. Q. That is what I mean. They occupied all of the 27th and all of the 28th running the 5-inch casing in that well? A. Yes, sir. Q. You were there on the 28th? A. Yes, sir. Q. Both morning and afternoon? A. Yes, sir. Q. Did you see the well flow in the afternoon or evening of December 28, 1927? A. I seen it flowing about 6:30 in the evening. Q. Had it flowed that day before that time? A. No, sir. Q. Do you know whether it flowed on the 27th? A. No; it did not. Q. Had it gone practically from 36 to 48 hours without flowing? A. Something like that. Q. Previously, had it flowed every 24 hours? A. Yes, sir."

As to the action of deceased under the circumstances, his testimony on page 65 is:

"Q. Did you see John N. Kill? A. Yes, sir. Q. At the time or about the time the flash occurred? A. Yes, sir. Q. Where was he? A. Right at the back end of the engine room. Q. Do you know how he happened to be back there? If so, tell us. A. Well, when the well started to flow he jumped into the dog house right beside the derrick, and it got to flowing so he couldn't get back out there, and there was only the one door, and he knocked a couple of planks off the back end, and he didn't come out, and I went around to see if he had got too much gas, and he was covering up his dinner pail with some old clothes, and I got him out, and we walked around the casing rack to the back end of the engine room, when the fire started. Q. Let's get the location of these things a little better. Tell the jury where the dog house was with reference to the well itself. A. Just off the edge of the derrick floor. It was just a place to go into to warm. Q. And put your dinner pail in? A. Yes, sir; and clothes. Q. You call that your dog house? That is right on the derrick, itself, on the floor of the derrick and close to the well? A. Just off the edge of the derrick floor. Q. How many feet from the well to the dog house? A. I would say 15 feet from the well. Q. How far from the well to the engine house or engine? A. About 60 feet."

At page 71, he testified that something like two hours before the explosion, he took a bucket of water from the floor of

the drilling rig and set it down by the boiler, for use in throwing on the bricks.

More of the testimony of these witnesses could be recounted, but we do not think it necessary. In the briefs, discussion is had as to what position, as a servant of defendant, Kill occupied. We do not think it necessary to go into a protracted discussion, in view of the fact that there was no one in charge superior to him when the emergency arose that was unforeseen, and in view of the fact that it has been definitely settled by the case of Kreps v. Brady, 37 Okla. 754, 133 Pac. 216, that the common-law rule as to negligence of a coservant was not abrogated by the constitutional provision on the subject.

There was some evidence to the effect that someone had put some water close to the boiler for use in emergencies. However, that was a simple matter of getting some water and throwing it on the bricks. The necessity, if any, for this was a matter that was peculiarly within the judgment of the deceased, perhaps more than anyone else. The deceased was in charge of the property of his employer. From the testimony about the talks with him in the hospital, it appears beyond any question that this was on his mind, whether he was rational or irrational. Evidently some of the tools had been burned, and evidently the deceased had been through a similar experience before.

With reference to his own safety, he of course had that within his own charge, as well as the property of the drilling company. It is very evident from what he did when the flow of oil began that it did not occur to him that he was in danger himself, or that his employer's property was in danger. As shown above, when the well started to flow, he jumped in the dog house beside the derrick, and the witness Alvin Galey says that after he had knocked a couple of planks off of the back end of the dog house, owing to the oil that was coming in at the door, he went around to see if the deceased had gotten too much gas, and that the deceased was at that time covering up his dinner pail with some old clothes.

To our mind, this is convincing that the deceased, skilled man that he was, never anticipated that matters would result as they did, otherwise regard for his own safety would have caused him to have gotten away from the dog house, but he was engaged at that time, not in getting away, but merely in protecting his dinner, a matter of very minor importance as compared with the danger that actually, as it turned out, did exist.

The only way the corporation could act was through the medium of its servants. As to what grade of servant the deceased was is immaterial, as he was there for the purpose of looking after the safety of everything, and it did not occur to him that there was any danger of an explosion. The company trusted him to look after this. He did his best, but the accident happened just the same. We think, under the conditions, that had the company sued him for negligence in allowing the tools to be burned, by reason of the explosion, there would have been no recovery on the part of the company. On the other, when the conditions are reversed, we do not think that representative of the deceased could recover from the company, in view of the fact that he was the agent of the company on whom the company necessarily must have relied to keep the place safe so far as gas and fire were concerned. As to the conditions of the atmosphere being damp, resulting in the fact that the gas did not seem to rise, none knew that better than the deceased. There does not seem to be any evidence of negligence on the part of the defendant company for which it would be answerable to a representative of the deceased.

We think the lower court could have done nothing else than to instruct on the evidence it had before it in favor of the defendant.

The cause is affirmed.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur.