**DARDEN v. NASHVILLE, C. & ST. L. RY. CO.**

No. 6412.

Circuit Court of Appeals, Sixth Circuit.

June 29, 1934.

800

W. K. Sullivan, of Cleveland, Ohio, and C. C. Grassham, of Paducah, Ky. (Charles C. Grassham, of Paducah, Ky., Newcomb, Newcomb & Nord, of Cleveland, Ohio, on the brief), for appellant.

G. T. Fitzhugh, of Memphis, Tenn. (Fitzgerald Hall, of Nashville, Tenn.; Nunn & Waller, of Paducah, Ky., and Fitzhugh, Murrah & Fitzhugh, of Memphis, Tenn., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

HICKS, Circuit Judge.

Action by Hobart M. Darden, appellant, under the Federal Employers' Liability Act (title 45, U. S. Code, c. 2, §§ 51–59 [45 USCA §§ 51–59]), against Nashville, Chattanooga & St. Louis Railway Company to recover damages for personal injuries. The question is whether the court erred in granting appellee's motion for a directed verdict.

The accident occurred in what is known as the Sixth street yard and engine terminal of appellee at Paducah, Ky., at about 10:30 on the morning of April 16, 1930. In this yard, which is located between Fifth and Eighth streets, there are, in addition to the main line, seventeen switch tracks. Among these are the "old team track" and the "new team track," hereinafter called old track and new track, which are principally used for setting out cars loaded with merchandise to be delivered to consignees. They extend from Fifth street westwardly curving gradually toward the south, and, after passing immediately south of a sandhouse, begin to converge until they intersect opposite the west end of a cinder pit which is under the second track north of the new track. Between the cinder pit and the new track is a stub track, the east end of which is about ten feet west of the sandhouse. Upon the stub track is a traveling crane to which is attached a dipper or clamshell. For ten years before the accident it had been the almost daily practice for switching crews to place a car on the new track to be loaded with cinders dug out of the pit by the craneman with the dipper, which when full was swung over by the crane and emptied into the cinder car. For this purpose it was necessary for the switching crews to place the cinder car at a point where it blocked the old track. When the loading was finished, the craneman, in an attempt to clear the old track, would place the dipper against the west end of the cinder car and shove it eastwardly, but, owing to varying conditions, such as the weight of the car, the degree of force used, the state of the weather, and the nature of the oil in the journals, the cinder car would not always clear the old track before it stopped. This method of shoving the cinder car, practiced daily, was a matter of common knowledge among the crews. They, as well as appellant, understood that a car shoved eastwardly and stopping before it sufficiently cleared the old track would be dangerous to employees riding upon the north side of a car moving thereon. For this reason it was the practice and duty of the switching crew, under the direction of its foreman, to look out for the cinder car, and, if it did not safely clear the old track, to shove it into the clear with the engine. Appellee had a rule in substance to this effect, the relevant portions of which are printed in the margin.[1]

On the day of the accident a cinder car had been loaded and shoved eastwardly upon the new track by the crane until its west end was about eight or ten feet west of the west end of the sandhouse, with a clearance between it and cars passing upon the new track of only fourteen to seventeen inches, a distance insufficient to clear a man riding on the north side of a car on the old track unless he was standing straight and directly against the car.

Upon that date, appellant, engine foreman of a switching crew, consisting of an engineer, fireman, and two switchmen, was at work in the yard. As a switchman and later as a foreman he had had eight or nine years' experience there. The crew was of course subject to his direction, and its duties were to switch cars in the yard upon orders received by appellant from the yard office.

---

[1] "There should be sufficient clearance between cars left on side tracks, and tracks adjoining, to prevent injury to persons who may be on the sides of cars."

Shortly before the accident, he went to the office for orders while the crew took the engine west on the main line to the switch leading to the old track. It then backed the engine east along the old track, past the sandhouse and across Sixth street, where it was coupled to a cut of six or seven cars. As the train started west again on the old track and toward the place of the accident, appellant boarded a box car next to the engine and stood in the stirrup on the north side of the car at its eastern end and hung with his elbow upon the grabiron. While riding in this position, facing the car, reading his orders and not looking in the direction in which he was going, and with the train running about six or eight miles an hour, the right side of his head struck the projecting southwest corner of the cinder car on the new track and he was knocked under the train and seriously injured.

It is appellant's contention that appellee furnished him an unsafe place to work, in that it left the cinder car too near the old track. We think that the rule requiring the master to furnish a safe place has no application. Appellant was fully acquainted with the method of handling the cinder car, and he could not assume that it would always clear, for it frequently did not. The probability that the cinder car would stop too near the old track was generally known, and for this very reason appellant was charged, not only by the rule and custom, but by positive orders, with the safety of the situation. He testified as follows:

"A. I never saw it, unless it was in the clear.

"Q. 243. Haven't you gone in there, yourself, and moved it closer down there for loading; anyway you knew it was your duty for the protection of the property, the protection of yourself and your men, it was your duty to ascertain whether the cars were in the clear, or not? A. Never found them

71 F.(2d)—51

out of the clear. The rules say, 'Keep them in the clear' and we would do it.

"Q. 244. I will ask you if that same question was asked you before and if you didn't answer you did know it was your duty under the rules to ascertain whether cars were in the clear and you did know you had to put them in the clear if they were not? A. The rule was to put them in the clear and we do.

"Q. 245. You understood the rule applied to all switchmen, and especially foremen, to ascertain whether in the clear or not, and if not, to put them in the clear? A. Yes.

"Q. 246. I asked you just now, if you, yourself, as switchman, prior to your becoming engine foreman, if you hadn't shoved it in the clear? A. I have shoved it back here where it would clear a man."

When a servant is charged by the terms of his employment with the duty of keeping his working place safe or of making a dangerous working place secure, there is no basis for liability against the master, for the rule requiring him to furnish a reasonably safe place is not operative. The master may not justly be charged with failure to perform a duty which the servant has expressly or impliedly assumed. The risk arising from such a situation must be classified among those ordinarily incident to the employment. See Narramore v. Cleveland, C., C. & St. L. Ry. Co., 96 F. 298, 301, 48 L. R. A. 68 (C. C. A. 6); Chesapeake & O. R. Co. v. Hennessey, 96 F. 713, 717 (C. C. A. 6); Dasher v. Hocking Mining Co., 212 F. 628, 632 (C. C. A. 6); American Bridge Co. v. Seeds, 144 F. 605, 613, 11 L. R. A. (N. S.) 1041 (C. C. A. 8); Finalyson v. Utica Mining & Milling Co., 67 F. 507, 510 (C. C. A. 8); Atchison, T. & S. F. Ry. Co. v. Wyer, 8 F.(2d) 30, 32 (C. C. A. 8).

The judgment of the District Court is affirmed.