CITY OF EDMOND v.
WASHAM, Adm'x.

No. 29478.  Dec. 24, 1940.

Rehearing Denied Jan. 13, 1942.

Application for Leave to File Second Petition for Rehearing Denied Feb. 3, 1942.

*121 P. 2d 300.*

Wade Arends, of Edmond, Everest, McKenzie & Gibbens, of Oklahoma City, and Frederick C. Oakes, of Edmond, for plaintiff in error.

Byrne A. Bowman and A. K. Little, both of Oklahoma City, and Wm. M.

Majors, Jr., of Edmond, for defendant in error.

HURST, J. The question for decision is whether the city of Edmond was guilty of actionable negligence in connection with the electrocution and resulting death of Hogan Washam.

The city of Edmond owns and operates an electric power and light system. In the spring of 1934, Washam was employed by the city, being selected out of a list of some 75 or 80 applicants, and was placed in charge of the distribution system and the other men in his department. His duties involved the inspection, care, supervision and maintenance of the lines, wires, poles, and other outdoor equipment. He thus became a vice principal or superior servant. Ruemmeli-Braun Co. v. Cahill, 14 Okla. 422, 79 P. 260; Wolverine Oil Co. v. Kingsbury, 66 Okla. 271, 168 P. 1021; City of Minneapolis v. Lundin, 58 F. 525, 7 C.C.A. 344; 39 C.J. 573, 585, 586; 18 R.C.L. 745.

Prior to his employment by the city, Washam had had some ten years of experience in this line of work. At the time of the accident he had three men working under him, an apprentice lineman, a ground man, and another man who was looking after the meters but who was experienced in line work and was subject to his call. On the 13th day of July, 1938, while he was engaged in removing a transformer from a crossbar of a pole, he came in contact with a high voltage wire carrying 2,300 volts and was electrocuted, as a result of which he died ten days later. The pole upon which he was working carried three 2,300-volt wires and three transformers were located on a crossbar below these wires, one transformer being west of the pole and two east of it. With the aid of two of his helpers, the ground man and the apprentice lineman, neither of whom was an experienced lineman, he had removed the transformer west of the pole and was engaged in removing the one most distant from the pole on the east, leaving undisturbed the middle transformer.

While thus engaged he came in contact with a wire leading from one of the 2,300-volt lines to the middle transformer, causing the fatal injury.

The widow filed this action for herself and two minor children to recover damages for Washam's wrongful death. The acts of negligence charged and relied upon are that the city failed to furnish Washam a safe place to work, sufficient safety appliances and tools with which to do the work, and sufficient skilled coworkers. The city defended on the theory that, Washam being placed in charge of the work as a vice principal or supervisor servant having superior knowledge of the work, they owed him no duty to furnish safety appliances, tools or coworkers except as he requested them, and if there was a deficiency in the safety appliances or coworkers furnished, it was his duty to ask for additional appliances or workmen.

The city also interposed the defenses of contributory negligence and assumption of risk, but under the view we take of the case those defenses need not be further discussed in the absence of proof of primary negligence on the part of the city. Gourley v. Jackson, 116 Okla. 30, 243 P. 243; Scott v. Folsom-Morris Coal Min. Co., 138 Okla. 147, 280 P. 622.

The record discloses that the city operated its light system on a budget, and Washam knew he had to keep within the budget. There is no evidence that he asked for any specific safety devices or equipment that were not furnished, or that the funds were insufficient to buy them if he had requested them. In submitting his request in making up the budget for the ensuing year, a short time before he was killed, he made no request for any safety equipment. Nor is there any evidence that he requested any additional or different coworkers or helpers.

The question, then, is whether the city was negligent in connection with the death of Washam. We think the rule governing this case, deducible

142

from the authorities, may be fairly stated as follows: The rule imposing upon the master the nondelegable duty to furnish his servant a reasonably safe place to work, reasonably competent fellow servants, and reasonably safe tools and appliances with which to work, has no application to a skilled and experienced superior servant or vice principal intrusted by the employer with the complete control and supervision of the work and the method of doing it, and upon whom rests the responsibility of advising the employer if additional tools, appliances or helpers are necessary for the safe performance of the work, in the absence of advice by the vice principal that such are needed and a request that they be furnished. See Kill v. Summitt Drilling Co., 153 Okla. 197, 5 P. 2d 346; American Coal Mining Co. v. Lewis, 77 Ind. App. 394, 133 N.E. 846; Duffy v. Hobbs, Wall & Co., 166 Cal. 210, 135 P. 1093; Albert v. McKay & Co., 174 Cal. 451, 163 P. 666; Logan v. Day, 110· Wash. 5, 187 P. 913; United States Cast Iron Pipe & Foundry Co. v. Granger, 172 Ala. 546, 55 So. 244; Kellerman v. Kansas City Long Distance Tel. Co., 189 Mo. App. 506, 176 S.W. 1059; Edward Hines Lumber Co. v. Dickinson, 155 Miss. 674, 125 So. 93; Darden v. Nashville, C. & St. L. Ry. Co. (C.C.A. Sixth Cir.) 71 F. 2d 799; City of Teague v. Radford (Tex. Com. App.) 63 S.W. 2d 376.

The philosophy underlying this rule is that "the master, having engaged a particular servant to discharge the duties owing by him to his other servants, ought not be required to engage still another servant to see that the particular servant discharges his duty, in order to avoid a liability should he be injured because of his failure to perform the specific duties for which he was engaged." American Coal Mining Co. v. Lewis, supra.

The instant case aptly illustrates the soundness of the foregoing rule. A city, like any other corporation, operates through and by employees. In 1934, when Washam was employed by the city, he knew that the distribution system was in very bad condition and he told Mr. Stephenson, the city manager who employed him, that "if it wasn't that I had been out of work so long and need the work, I don't think I would take the job." At the time he was employed, Mr. Stephenson advised him that "I will have to depend on you, Mr. Washam, a great deal. I know very little about this part of the work. I have the utmost confidence in you." The other managers under whom he worked also knew very little about the work, and they advised him that the system was his to look after and that they looked to him to see that his work was properly done. It was for him to check the system for defects and remedy them with such material, appliances, and help as would be furnished him on his request. At the time of the unfortunate accident he was building a new line with new and longer poles and new material to replace the old line and poles. The pole on which he was working was overloaded and there was insufficient space on it for him and a helper to move around and do the work. There is evidence that the middle transformer was installed after Washam was put in charge of the system. The evidence indicates that the light bracket on which he was standing at the time he received the shock was grounded and was defective, but the city looked to him to make proper inspection and remedy all such defects. It was for him to discover such defects and advise the city as to what was needed to remedy the defect, instead of it being the duty of the inexperienced city manager or other officers to discover the defect and warn Washam. Washam had worked on the pole before and knew it was dangerous and referred to it as "that stinking pole." Just before the accident a member of the city council suggested that he have the current disconnected at the plant while he did the work, but he did not want to cut the current off half the town for the 30 minutes he would be doing the work, as there would be some kick if

he did so, and it would take just a little longer to do the work with the current on. The record discloses that there were at least four distinct methods that Washam could have selected to do the work: (1) He could have had the current cut off at the generating plant; (2) he could have had the wire leading from the high voltage wire to the transformer disconnected from the high voltage wire; (3) he could have had said wire disconnected from the transformer and hooked up out of the way; or (4) he could have selected the method he did select. The first was the absolutely safe way. The other three entailed some danger and required caution to be observed. There was in the city truck where the work was being done a rubber blanket that Washam could have wrapped around the live wire with which he came into contact, and which was made for that purpose, and it would have protected him against the live wire. There was another rubber safety device, known as a snake, in the truck, but it was defective and might not have given protection. It was for Washam to select, for the city, the method to be followed and the safety precautions to be taken in following that method. This was the very purpose for which he as an expert was employed. If additional safety appliances such as "snakes" and other rubber devices were needed to use in working with live wires, it was for him to ask it, and not for the city manager or other officers to suggest it to him.

If Washam selected the wrong method or did not use proper care in pursuing the method selected, the fault was his, not that of the city, and his own negligence (not contributory negligence) was the proximate cause of the accident. See Willaman v. City of Fairview, 157 Okla. 239, 11 P. 2d 453.

We have examined the authorities relied on by the plaintiff, and do not believe they are contrary to the conclusion we have reached. Some of them have to do with employees, not vice principals. See, for instance, Oklahoma Gas & Electric Co. v. Oliphant, 172 Okla. 635, 45 P. 2d 1077. Some have to do with the defenses of assumption of risk and contributory negligence, which under section 6, art. 23, of our Constitution are always questions of fact for determination by the jury where there is evidence to support them. But, as above stated, such defenses do not come into play unless and until the plaintiff proves primary negligence on the part of the defendant. It is not always easy to see the line of demarcation between the question of primary negligence and such defenses, but it is necessary to do so in order not to confuse the issues bearing on each. Often, as here, the same evidence has a bearing on both. This line of demarcation is not important in the other states that do not have a constitutional provision, like ours, making such defenses questions of fact for determination by the jury, and this fact must always be kept in mind in considering authorities from the other jurisdictions.

In view of the evidence and the foregoing principles, we conclude that the plaintiff failed to establish primary negligence—breach of a duty the city owed Washam—and the trial court should have instructed a verdict for the defendant.

Reversed, with instructions to dismiss the cause.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, OSBORN, GIBSON, and DAVISON, JJ., concur. NEFF, J., concurs in conclusion. CORN, J., absent.