**Albert O. HATLEY, Appellant,**

v.

**MOBIL PIPE LINE COMPANY, a Subsidiary and Division of Socony Mobil Oil Company, Inc., and Orin Reeser, Individual and Agent, Appellees.**

**No. 44274.**

Supreme Court of Oklahoma.

April 10, 1973.

Rehearing Denied July 31, 1973.

Alex Cheek and William C. McAlister, Oklahoma City, for appellant.

Watts, Looney, Nichols & Johnson, by Clyde J. Watts, Jay M. Galt, Oklahoma City, for appellees.

BARNES, Justice:

This appeal involves an action for damages for personal injuries sustained by a lineman in dismantling a telephone line on an easement owned by Mobil Pipe Line Company, hereinafter referred to as "Modbil" or "defendant". Mobil's said easement traversed a distance of some 90 miles between Oklahoma City and this State's Drumright-Yale area. On it, Mobil installed its private telephone system many years ago and thereafter used the system in connection with its pipe line operations. Later, when the Turner Turnpike was constructed more than twenty years ago, portions of the telepone line's route had to be modified or relocated to cross that highway.

By 1968, Mobil no longer used the system and decided the line should be dismantled. To accomplish this, it entered into a contract, called a "Bill of Sale", with one K. Mjolhus, d/b/a Panhandle Crane Service, of Amarillo, Texas, hereinafter referred to as "Pan Crane". In the contract, Mobil agreed to sell Pan Crane certain personal property comprising the telephone system on its said easement, including the telephone poles and certain numbers of pounds of various kinds of telephone wire, estimated to be strung on the poles, at a certain price per pound for the #8 copper wire in the line. To pay this consideration, Pan Crane deposited more than $31,000.00 with Mobil, and, under the contract, the total price Pan Crane finally paid Mobil was to be computed ("settled") on the basis of the total weight of the wire removed.

As a part of the consideration, Pan Crane agreed to dismantle the line and remove both telephone wires and poles from Mobil's easement premises, and to then

"clean up the premises . . ." to Mobil's "satisfaction", all at Pan Crane's expense.

.The contract also subjected Pan Crane to damages in the event the work was not completed within a specified time, and it provided that Mobil would have "an Inspector available who will point out the wires, telephone poles, and other appurtenances that are to be dismantled and removed . . . ."

The contract specifically provided that Pan Crane would furnish all the labor and equipment necessary for the job, that it would comply with all of Mobil's insurance requirements before any dismantling or removing from the easement premises occurred, and that it would hold Mobil harmless from and against all claims of every kind and character by third parties, including Pan Crane's employees, on account of personal injuries or death. The contract also recited that Pan Crane had inspected "all of the personal property hereby sold and conveyed and accepts title . . . (to it) . . . in its present condition and at its present location." The same paragraph of the contract also recited that Mobil "excludes and disclaims any implied warranty of merchantability and warranty as to the condition or serviceability of said personal property."

About three weeks after Pan Crane had started its performance of the above contract near Northeast 23rd Street in Oklahoma City, the dismantling of the telephone line and removal of its poles had progressed in a northeasterly direction to a point on Mobil's easement between Chandler and Stroud, where the line crosses over the Turner Turnpike on telephone poles standing on both sides (north and south) of this highway. By a plan that was devised to minimize the obstruction of Turner Turnpike traffic from falling wires, two of Pan Crane's linemen were to ascend the pole along the north side of the Turnpike (hereinafter referred to as the "north pole") and the pole along the south side of the Turnpike, and, at a given signal, cut each wire extending over the road between

the two poles at the same time; and, when the wire fell to the ground, one man standing in the Turnpike's median would cut it in two pieces; then others stationed on either side of the road's traffic lanes would quickly pull each cut piece north and south, respectively, out of the way of the Turnpike traffic.

The Appellant, Albert O. Hatley, hereinafter called "plaintiff", was the lineman assigned to climb and cut the wire from the north pole, and Orin Reeser, whose title with Mobil was that of "Division Lineman" and who had stationed himself in the Turnpike's median, was to cut the wires in two when they fell to the ground, so that Pan Crane's employees could more quickly pull the two cut pieces off of the road. As far as appears from the record, the only task Reeser had to perform *for Mobil* on the project was to assist a Mr. Frank Lancaster, who Mobil had sent from its Dallas headquarters to be its "Inspector" under the above described contract with Pan Crane. According to Reeser's testimony, he and Lancaster were there to see that the copper wire was all taken down and accounted for and that, when the telephone poles were pulled out of the ground, the holes in the easement premises were filled up.

After plaintiff had gaffed his way up the north pole, had looped his safety belt around the crossbar at the pole's top, and he and the lineman on the south pole had simultaneously cut three of the wires connecting the two poles, without mishap, the last wire was cut. When this occurred, the north pole broke off about even with the surface of the ground, and fell to the ground in the same northeasterly direction that its guy wires pulled, carrying plaintiff with it. After the accident, it was found that the inside of that pole, where it broke off, was rotten.

Plaintiff thereafter instituted the present action to recover damages for the personal injuries he received in the fall, and named only Mobil and Reeser as defendants. His cause of action against them was based

upon their alleged negligence in the following particulars set forth in his petition:

"(a) Defendants were guilty of negligence by causing, suffering and permitting a trap, pitfall, danger, and snare to exist on their easement premises causing injuries and damages to the plaintiff.

"(b) Defendants invited plaintiff upon the premises and represented to plaintiff that the premises were safe when, in fact, they were dangerous, and failed to warn plaintiff that the pole was brittle, aged and defective.

"(c) Defendants were negligent in failing to inspect and discover the aforementioned hazardous condition which existed so as not to expose plaintiff to a dangerous condition maintained by them on the easement right-of-way.

"(d) Defendants were careless in failing to inspect at reasonable intervals the unsafe condition of the premises so as to discover and warn the plaintiff.

"(e) The defendants were negligent in causing, suffering and permitting the pole to become deteriorated and weakened, when they knew, or should have known by exercise of ordinary care, that the plaintiff might be reasonably expected to go upon the pole to dismantle the lines, and that the pole would fall causing plaintiff's injuries.

"(f) Defendants were negligent in failing to remove the trap, pitfall and danger, having the prior ability to know that it was in that condition and was a hazard and danger to persons upon the premises.

"(g) Defendants were guilty of negligence in failing to give the plaintiff notice of the danger and in failing to keep a lookout for such dangerous condition to avoid plaintiff's injury.

"(h) Defendants were negligent by inviting and instructing plaintiff to go upon the premises and on the pole when defendants knew, or should have known, that plaintiff would be in danger and suffer injury by reason of defendants' actions, representations and instructions to plaintiff."

In defendants' answer, they, in effect, denied that they owed plaintiff any of the duties referred to in his petition, and pleaded that under Mobil's contract with Pan Crane the risk of accidents, such as here occurred, was assumed by plaintiff and/or his employer, Pan Crane (an independent contractor), and that the liability for plaintiff's injuries from the accident had been satisfied by an award of Workmen's Compensation insurance to plaintiff against Pan Crane and its insurance carrier previously entered by the State Industrial Court and a joint petition settlement between plaintiff and Pan Crane's Workmen's Compensation insurance carrier in the sum of $9,750.00, which plaintiff had received and accepted.

At the trial, after plaintiff had introduced his evidence on the issue of defendants' liability, the trial court sustained defendants' demurrer to said evidence; and plaintiff thereafter lodged the present appeal.

The Court of Appeals reversed the trial court on the theory that Mobil and Reeser owed plaintiff a duty to provide him with a safe place to work or to warn him of the unsafe condition of the telephone pole which fell. We disagree, and have granted certiorari.

In urging error in the trial court's ruling, plaintiff relies upon the general rule stated at 41 Am.Jur.2d, "Independent Contractors", § 27, in succinct part as follows:

"One going upon another's property as an independent contractor, or as an independent contractor's employee, is an invitee to whom the property owner is liable for an injury occasioned by an un-

safe condition of the premises encountered in the work, which is known to the property owner but unknown to the injured person."

The defendants contend that there is an exception to the above stated general rule that applies to the present case. About this, Section 28 of the above publication says:

"As an exception to the general rule requiring the owner or occupier of premises (the contractee) to furnish a safe place of work to an independent contractor and the latter's employees, the owner or occupier is under no duty to protect them against risks arising from or intimately connected with defects of the premises . . . which the contractor has undertaken *to repair.* Closely related to this exception is the rule that the owner is not liable for death or injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert, has known, or as to which he and his employees 'assumed the risk'." (Emphasis added)

Plaintiff seeks to draw a distinction between this case and so-called "repair" cases such as Whitlow v. Seaboard Air Line Railroad Company (U.S.C.A., 4th Cir.), 222 F.2d 57, and City of Edmond v. Washam, 190 Okl. 140, 121 P.2d 300, by pointing out that here Mobil did not contract with Pan Crane to repair, replace, or rearrange the telephone line. Defendants, on the other hand, contend that since removal of telephone poles, of uncertain age and known to have been in place many years, from Mobil's easement, was a part of the work Pan Crane contracted to perform, Pan Crane assumed the risk of one or more of them having deteriorated in such a way as to make its work dangerous, unless performed in such a way as to guard against such danger.

We think that clarity may be given the statement of the principles applicable to cases of this kind by avoiding the use of the word "repair". This the United States Court of Appeals has done in Vecchio v.

Anheuser-Busch, Inc., 2 Cir., 328 F.2d 714, 718, by stating them, as applied in New Jersey, as follows:

"  .  .  .  where an owner of property engages an independent contractor to do work on his premises, he owes to the contractor's employees who enter the premises to perform the work the duty of exercising reasonable care to furnish them with a safe place to work. * * * (citing cases)

"This duty is qualified, however, by the rule that one who engages an independent contractor to do work for him, and *who does not himself undertake to interfere with or direct that work,* is not obligated to protect the employees of the contractor from hazards *which are incidental to or part of the very work which the independent contractor has been hired to perform.* * * * (citing cases)" (Emphasis added)

In the present case, the hazard involved in its linemen's climbing telephone poles to detach the telephone wires stretching between the poles was a hazard incidental to, and a part of, "the very work" (dismantling the telephone line) which Pan Crane, apparently a specialist in such work, agreed to perform under its contract with Mobil. If climbing the poles was not necessarily involved in removing the wire from them, Pan Crane, as far as the evidence shows, was free to select any method of dismantling the line that would avoid that hazard.

Some courts have recognized a presumption that a telephone lineman assumes risks such as the one involved in this case. See McIsaac v. Northampton Electric Lighting Co., 172 Mass. 89, 51 N.E. 524, Lynch v. Saginaw Valley Traction Co., 153 Mich. 174, 116 N.W. 983, 21 L.R.A., N.S., 774, and Hines v. Martel Telephone Co., 127 Neb. 398, 255 N.W. 233. But the question here is: If, as is recognized generally, the proprietor of premises may, by contract with a business invitee's employer, relieve himself—as to dangers incidental to or a part of the particular work said employer

therein agrees to perform—of the duty of proprietors to protect business invitees, generally, against hidden dangers on the premises of which the proprietors are, or should be, aware, did Mobil, through its employee, Reeser, "interfere with or direct" the work involved here in such a way as to lose such relief?

Plaintiff attempted to establish Mobil's vicarious or derivative liability for his injury by showing the authority and participation of its employee, Reeser, in the project. Thus, Pan Crane's employee, John Leroy Short, whose task was to quickly pull, north across the Turnpike, one of the pieces of each telephone wire after Reeser, who had stationed himself in the Turnpike's median, had cut the wire in two, testified on direct examination concerning Reeser:

"Q. What was his position there?

A. I assume that he was—well, I should—should I say supervisor for Mobil, that is what I thought.

\* \* \* \* \* \*

Q. Had you seen him before this day, the 28th?

A. Yes, I had.

\* \* \* \* \* \*

A. Well, it was various times, you know, maybe two or three days before, maybe, I think it was the day before.

Q. Now, during any of this time, had there been any comments or instructions by Mr. Reeser?

A. Well, no—do you mean advice or something like that?

Q. I'm asking you to tell what you heard him say.

A. Well, his instructions were brief I mean, you know, like showing us what to do and do it efficient, you know.

\* \* \* \* \* \*

Q. . . . Tell the Court approximately what that was.

A. Okay, I remember a distinct time when it was real hot one day, we was under a shade tree and had come down this dirt road and heading north, and, let's see, maybe a day's work before we happened to get to our accident and we was climbing this pole at the time and it was pretty rotten and he gave us advice on how to work this out and everything.

Q. Now, . . . that was the day before?

A. The day before or two days earlier.

Q. \* \* \* Now, . . . did he give any instructions to Mr. Hatley or anybody else about this particular pole that fell with Mr. Hatley?

A. Not that I can remember."

Plaintiff's witness, Walter Nicks, testified that he was a tractor operator for Pan Crane and was "spooling wire up" the day of the accident. An excerpt from his direct examination is as follows:

"Q. Well, now, would you tell whether you saw Mr. Reeser of Mobil there that day?

A. I don't recollect whether he was there or not, but I believe he was. I'm pretty sure he was.

Q. What had he been doing on this job?

A. He had been ramrodding it.

Q. What do you mean by that, sir?

A. Well, bossing, whatever you want to call it.

Q. Tell us what he said and did.

A. Well, he just wanted us to get that wire spooled up and he would help me hook it onto my spool.

\* \* \* \* \* \*

Q. Then what would you all do with it?

A. They would load it onto the truck and take it to the warehouse."

Plaintiff's twin brother, Delbert, who testified that he had been a journeyman lineman for Public Service Company the past five years, testified that he had worked on the subject project near Chan-

dler and he had seen Reeser there. When plaintiff's counsel asked the witness what Reeser was doing there, he stated: "He was kind*ly* pushing the job out there so far as I could tell." When asked what he meant by that, the witness stated: "He was telling everybody what to do out there." When the witness was interrogated further about this, he testified as follows:

"Q. Now, in what manner did Mr. Reeser tell you all what to do?

A. Well, the day I was out there, we was cutting wire down and they was wanting to get five miles that day and they was kind of pushing us.

\* \* \* \* \* \*

Q. Will you tell His Honor, please, what was said by Mr. Reeser . . . ?

\* \* \* \* \* \*

A. He said 'we are going to get this other mile of wire down before we take off.'

\* \* \* \* \* \*

Q. Did you stay and get the other mile of wire out?

A. Yes, sir."

The witness' cross-examination on the subject was as follows:

"Q. Who was your boss?

A. I didn't know who was the boss out there.

Q. You didn't look to Mr. Reeser?

A. Well, he was giving orders out there.

Q. To whom?

A. Everybody.

\* \* \* \* \* \*

Q. What did he say to you?

A. Well, he was just telling us how to do the job out there.

Q. Well, tell me some specific thing he told you.

\* \* \* \* \* \*

A. I don't remember just what he said but he was out there giving orders.

Q. Did he ever say anything specifically to you?

A. Well, no, sir, not specifically to me.

\* \* \* \* \* \*

Q. To whom did you hear Mr. Reeser give an order?

A. Albert.

Q. What did he say to Albert?

A. Well, he just told him where he was going to start to work that morning and what we was going to do.

\* \* \* \* \* \*

Q. Did you ever hear Mr. Reeser tell any of those employees of Panhandle how to do anything?

A. I didn't hear him tell them how to do anything. \* \* \*"

Mr. David Dooley, an Oklahoma City consulting engineer, was one of plaintiff's witnesses. He testified among other things, that he had inspected the scene of the accident and saw the telephone pole on which plaintiff fell; that the pole had stood in a farmer's field separated by a fence from the Turnpike right-of-way; that the surrounding terrain dips gently toward the right-of-way; that when the Turnpike was constructed the surface of the ground was left in such a condition that it interfered with the field's normal drainage and left a small slough, or sunken spot, where water accumulated; that instead of draining off or drying out in a few days after a rain, this kept the soil moist for longer periods of time, and, where this condition existed on the ground around the submerged part of the telephone pole, it would cause that part of the pole to rot quicker than if the ground "were permitted to dry out quickly and normally after rainfall." Dooley exhibited pictures of the broken pole and pointed out that the outside of it, where its wood had dried the fastest, appeared to be relatively sound, but that the interior, which was not exposed to sun and wind and remained moist longer, was decayed. Dooley testi-

fied on cross-examination that a screwdriver could have been driven into the pole, with a hammer, about ground level, and "a couple of licks" would have revealed that the inside of the pole was rotten; and this rottenness could have been discovered without digging out any dirt from around the pole.

Plaintiff testified that he had been a lineman six or seven years and a journeyman for five. He named five previous employers that he had done line work for and gave the names of two that had safety men who checked out the poles and tagged those that were unsound, ahead of the linemen. He also testified that four of his employers left it to their linemen to determine whether or not their poles were safe to climb, as did Pan Crane in this case. Plaintiff further testified that Pan Crane's Mr. Williamson was his supervisor on the job and that Williamson drove a pickup truck to the job site. Plaintiff further testified that Reeser was present when the plan was formulated on the morning of the accident as to how the telephone line extending across the Turnpike would be dismantled; that Reeser told him there were few of those poles he hadn't climbed. The record of plaintiff's testimony continued as follows:

"Q. Tell what you did before you went up that pole.

A. I walked up to the pole, had a twenty-four ounce hammer, and hit the pole and it sounded good to me, so I went ahead and climbed the pole.

* * * * * *

Q. . . . what does that (hitting the pole with a hammer) tell you?

A. . . . tells you whether it is rotten or not. . . .

Q. What was the condition of the terrain or the ground around that area?

A. Well, it was dry.

* * * * * *

Q. Now did you do anything else in regard to the pole?

A. Kicked it with my foot, tried to shake it, it wouldn't shake.

* * * * * *

Q. . . . what was Mr. Reeser doing at that time?

A. He was out there hollering, telling me to cut them wires and get them down, we was tying up traffic on down the highway there."

An excerpt from plaintiff's cross-examination is as follows:

"Q. . . . did you see this brand on the pole, how long it had been since it was creosoted?

A. Yes.

Q. And it was available to you so that you could know that the pole had not been creosoted since 1949, wasn't it?

A. Yes.

Q. Now, you did have a shovel available to you so that you could dig down and check below the surface?

A. Yes.

Q. Where was that shovel when you climbed that pole?

A. It was in the back of Williamson's pickup.

* * * * * *

Q. Now, did you also have a screwdriver or some other kind of tool so that you could drive it into the pole and see if it was rotten if you dug down?

A. Yes, sir.

Q. Did you ever do that from time to time?

A. Yes, sir, I have used that.

* * * * * *

Q. Now then, you say Mr. Reeser was on the job from time to time?

A. Yes, sir.

* * * * * *

Q. . . . Did he ever tell you how you should do your work?

A. No, sir.

Q. Did he ever tell you, at any time, about a pole that you were about to climb, whether it was safe or unsafe?

A. No, sir."

We have carefully examined and considered all of the testimony of plaintiff's witnesses that might be claimed to show that Mobil, through Reeser, undertook to interfere with or direct the dismantling of the telephone line. And, as said in Riverland Oil Co. v. Chisholm, 143 Okl. 120 125, 287 P. 379, 383:

"* * * We find there are some isolated questions with their answers in his evidence, which, standing alone, might be so construed; but the effect of the whole evidence in this case should not be determined in that manner. Chicago, R.I. & P. Ry. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735."

If there had ever been any direct evidence that Reeser knew the rotten condition of the pole before plaintiff ascended it, we might be loath, from a humanitarian standpoint, to say that Reeser had no duty to apprise plaintiff of this knowledge. But there is no such evidence. Suffice it to say that we think the fact that Reeser had volunteered assistance to Pan Crane's employees in other matters was insufficient under the circumstances of this case and under the rule we have quoted from Vecchio, supra, and which we adopt as sound law, to place upon Reeser, or his employer, Mobil, the duty which plaintiff sought to invoke against them in this case. We therefore hold that because plaintiff's evidence established no such duty, the trial court committed no error in sustaining defendants' demurrer to it. Said court's judgment dismissing the action in accord with said ruling is therefore affirmed; and the Court of Appeals' decision reversing said judgment and remanding the cause for a new trial is hereby reversed.

All Justices concur.